KEVIN A. DARBY, NVSB#7670
TRICIA M. DARBY, NVSB#7956
DARBY LAW PRACTICE, LTD.
4777 Caughlin Parkway
Reno, Nevada 89519
Telephone: (775) 322-1237
Facsimile: (775) 996-7290
E-mail: kad@darbylawpractice.com

Proposed Counsel for Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

In re:

HICKORY LEASING LLC,

                    Debtor.

_____/

CASE NO.:   BK-N-18-51222-BTB
Chapter 11

**MOTION TO: (1) ASSUME ASSET PURCHASE AGREEMENT; AND (2) SELL SUBSTANTIALLY ALL OF DEBTOR'S ASSETS**

Hearing Date:
Hearing Time:

Debtor and Debtor in Possession, HICKORY LEASING LLC ("HL"), by and through counsel, KEVIN A. DARBY, ESQ. of Darby Law Practice, LTD., moves this court for the entry of an order approving the assumption of that certain Asset Purchase Agreement dated October 22, 2018, between the HL, BTH QUITMAN HICKORY, LLC ("BTHQH") case number 17-51375-BTB, HICKORY OPERATING 1 LLC ("HO1") case number 18-51223-BTB, HICKORY OPERATING 2 LLC ("HO2") case number 18-51224-BTB and HICKORY OPERATING 3 LLC case number 18-51225-BTB  ("HO3" and collectively with HL, BTHQH, HO1 and HO2 the "Debtors") as sellers and Mohegan Renewable Energy (MS) ("MRE") as buyer (the "Asset Purchase Agreement") and approving the sale of substantially all of Debtor's assets to Mohegan Renewable Energy (MS), LLC as provided in the Asset Purchase Agreement (the "Motion").  This Motion is made pursuant to 11 U.S.C. §§363 and 365, Fed. R. Bankr. P. Rules 2002(a)(2), 6004 and 6006, and is supported by the Declaration of Neal Smaler and the following points and authorities.  A copy of

the Asset Purchase Agreement is attached hereto as Exhibit 1.

**POINTS AND AUTHORITIES**

**I.      Summary of Relief Requested**

This Motion seeks an order approving HL's assumption of the Asset Purchase Agreement and the sale of substantially all of HL's assets as part of a joint sale by the Debtors to MRE for cash in the amount of $3,999,999.99.

**II.     Jurisdiction, Venue and Predicates for Relief**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are Sections 105(a), 363 and 365 of the Bankruptcy Code.

**III.    Factual Background**

4.      The Debtors collectively own a wood pellet plant located in Quitman, Mississippi (the "Quitman Plant").

5.      On December 10, 2017, BTHQH, HL's affiliate, filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

6.      During BTHQH's Chapter 11 case, the assets of all Debtors were thoroughly marketed and an auction sale of those assets occurred in the United States Bankruptcy Court for the District of Nevada on October 22, 2018.

7.      MRE's bid was the only bid submitted and a "Qualified Bid" as that term is defined in Exhibit 1 to the *Order Approving Bidding Procedures and Setting a Date for the Sale Hearing* (Dkt. No. 241) (the "Sale Procedures Order"). Accordingly, MRE is the Prevailing Bidder as that term is defined in Exhibit 1 to the Sale Procedures Order.

8.      On October 22, 2018, Debtors entered into the Asset Purchase Agreement (the "APA") with MRE for the sale of substantially all of Debtors' assets to MRE for $3,999,999.990, as fully set forth in the Asset Purchase Agreement. The sale is scheduled to close on or before November 23, 2018. MRE is acquiring Debtors' assets free and clear of any lien, claim or encumbrance.

9.    Consistent with the terms of the APA, on October 26, 2018, HL, HO1, HO2 and HO3 each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

**IV.    Legal Argument**

A.    This Court Should Approve Assumption of the Asset Purchase Agreement.

10.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a).  "The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" In re Orion Pictures Corp., 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 Collier on Bankruptcy §365.01[1] (15th Ed. 1993)).  The standard applied to determine whether the rejection of an unexpired lease should be authorized is the "business judgment" standard.  LRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984).

11.    The Debtors, in their business judgment, have determined that assumption of the Asset Purchase Agreement is in the best interest of the Debtors and Debtors' creditors.  The Debtors have no ability to operate and a sale of their assets is the only way creditors of the Debtors' bankruptcy estates can or will be paid anything.

12.    In light of the foregoing, this Court should approve the assumption of the Asset Purchase Agreement under Section 365(a) of the Bankruptcy Code.

B.    This Court Should Approve the Sale of Debtors' Assets Free and Clear of Liens Pursuant to 11 U.S.C. § 363.

13.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Courts have uniformly held that approval of a proposed sale of a debtor's assets outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that sound business reasons justify the transaction. See Committee of Equity Security Holders v. Lionel Corp, (In re Lionel Corp.), 722 F.2d 1063-1069-71 (2d Cir. 1983); Walter Sunwest Bank (In re Walter), 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (stating "[u]nder  Section 363, the debtor in possession

-3-

can sell property of the estate outside the ordinary course of business if he has an articulated business justification.") (citations omitted); <u>Stephens Indus. Inc. v. McClung</u>, 789 F.2d 386, 389-90 (6th Cir. 1986) (stating "a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under §363(b)(1) when a sound business purpose dictates such action"); <u>In re Phoenix Steel Corp.</u>, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (finding elements necessary for approval of a Section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").  Section 363(b) provides protection for the purchaser of the Debtors' assets from a later appeal seeking to unwind the sale.

14.   Once the Debtors articulate a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal quotations omitted).  The Debtor's business judgment "should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." <u>In re Aeravox, Inc.</u>, 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (internal citations omitted).

15.   Here, the Debtors seek to sell substantially all of their assets to MRE for $3,999,999.99. The proposed sale has been heavily negotiated and all secured creditors of the Debtors were included in those negotiations.  The Debtors' secured creditors have agreed to waive any credit bid rights, as part of the sale to MRE.  In this regard, the Debtors are informed and believe that all of the Debtors' secured creditors support the proposed sale to MRE.  The Debtors believe the sale to MRE is fair, equitable and a sound business decision. Debtors further believe the sale is in the best interests of the creditors and the estate.

16.   The Debtors' assets will be sold to MRE free and clear of all liens, claims, and encumbrances pursuant to 11 U.S.C. §363(f).  This sale qualifies for the protection of Section 363(f) because the first priority lien of the Clarke County Mississippi Tax Collector will be paid in full and all other secured creditors consent to the sale.  No other party has an enforceable secured claim against the Debtors' assets under 11 U.S.C. §506.

17.     This sale and MRE also qualify for the protections provided by 11 U.S.C. § 363(m), as per the Ninth Circuit Bankruptcy Appellate Panel standards set forth in In re PW, LLC, 391 B.R. 25, at 35-37 (B.A.P. 9th Cir. 2008).  MRE is a good faith buyer as that term is used in Section 363(m) of the Bankruptcy Code. The sale to MRE was negotiated, proposed and entered into by the parties in good faith, from arm's length bargaining positions and without collusion.  Therefore, MRE is entitled to the protections of Section 363(m) of the Bankruptcy Code with respect to the Debtors' assets and this sale.

18.     Neither the Debtors nor MRE have engaged in any conduct that would cause or permit the sale to be voided under Section 363(n) of the Bankruptcy Code.

19.     A valid business purpose exists for approval of the transactions contemplated by this Motion pursuant to Sections 105, 363(b), (f), and (m) of the Bankruptcy Code.  With Court approval, the Debtor may sell, transfer and assign its assets free and clear of all liens, claims, interests and/or encumbrances in accordance with Sections 105 and 363 of the Bankruptcy Code.  As a condition to purchasing the Debtors' assets, MRE requires that (a) Debtors' assets be sold free and clear of all liens, claims, encumbrances, options, rights of first refusal and other interests; and (b) MRE shall have no liability whatsoever for any obligations of or claims (including without limitation as defined in Section 101(5) of the Bankruptcy Code) against Debtors.

## V.    CONCLUSION

Based on the foregoing, the Debtors respectfully request this Court approve HL's assumption of the Asset Purchase Agreement and the sale contemplated by the Asset Purchase Agreement. Debtor further requests this Court waive the 14-day stay on the order granting this motion under Fed. R. Bankr. P. 6004(h), so the sale may close on or before November 23, 2018, as required by the Asset Purchase Agreement.

DATED this 26th day of October, 2018.

DARBY LAW PRACTICE, LTD.

By:     /s/ Kevin A. Darby
KEVIN A. DARBY, ESQ.
Proposed Counsel for Debtor in Possession

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 1**

**EXHIBIT 1**

_____

ASSET PURCHASE AGREEMENT

_____

By and between

MOHEGAN RENEWABLE ENERGY (MS), LLC

and

BTH QUITMAN HICKORY, LLC, HICKORY OPERATING 1 LLC,

HICKORY OPERATING 2 LLC, HICKORY OPERATING 3 LLC, and

HICKORY LEASING LLC

Dated as of October 22, 2018

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (as amended or modified, the "**Agreement**") is made and entered into as of October 12, 2018 (the "**Execution Date**"), by and between Mohegan Renewable Energy (MS), LLC (together with its permitted successors, designees and assigns, "**Buyer**"), and BTH Quitman Hickory LLC ("**BTH**"), Hickory Operating 1 LLC, Hickory Operating 2 LLC, Hickory Operating 3 LLC, and Hickory Leasing LLC (collectively, "**Seller**" and, together with Buyer, the "**Parties**").  This agreement amends and restates in full that certain Asset Purchase Agreement between the Parties dated October 12, 2018.

## RECITALS

WHEREAS, Seller owns production facilities in Quitman, Mississippi and was engaged in the industrial wood pellet manufacturing and distribution industry (as such business was conducted by Seller, the "**Business**");

WHEREAS, on December 10, 2017 (the "**Petition Date**"), BTH filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**"), commencing a voluntary proceeding (the "**Bankruptcy Case**") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**");

WHEREAS, it is contemplated that Hickory Operating 1 LLC, Hickory Operating 2 LLC, Hickory Operating 3 LLC, and Hickory Leasing LLC will file voluntary petitions for relief in the Bankruptcy Court, commencing voluntary proceedings pursuant to chapter 11 of the Bankruptcy Code;

WHEREAS, Seller desires to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Seller, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Acquired Assets (as defined herein) and the Assumed Liabilities (as defined herein);

WHEREAS, Seller has determined that it is advisable and in the best interests of its estate and the beneficiaries of such estate to consummate the transactions provided for herein pursuant to the Sale Order (as defined herein) and has approved this Agreement; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order to be entered in the Bankruptcy Case.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Seller and Buyer hereby agree as follows:

DM_US 155473279-19.104097.0012

# ARTICLE 1
# DEFINITIONS

1.1 <u>Certain Terms Defined</u>. Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings ascribed to such terms in **Appendix A** attached hereto and as set forth elsewhere herein.

1.2 <u>Interpretation</u>.

(a) When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

(b) Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(c) The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(d) The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e) A reference to any Party to this Agreement or any other agreement or document shall include such Party's permitted successors and assigns.

(f) A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g) Any reference in this Agreement to $ shall mean U.S. dollars.

(h) The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

# ARTICLE 2
# PURCHASE AND SALE OF THE ACQUIRED ASSETS

2.1 <u>Purchase and Sale of Assets</u>. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing, Buyer shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Buyer, all of Seller's right, title and interest in, to and under all of Seller's tangible and intangible assets, properties, rights and claims, as the same shall exist as of the Closing Date, of whatever kind or nature and wherever situated or located, other than

3

the Excluded Assets (collectively, the "**Acquired Assets**"), free and clear of all Liens, Claims, Interests or Encumbrances (other than Permitted Liens), including the following:

      (a)    all accounts receivable, notes receivable, negotiable instruments, chattel paper (including, without limitation, completed work that has not yet been billed) and other receivables (including, without limitation, in respect of goods shipped, products sold, licenses granted, services rendered or otherwise and all amounts that may be returned or returnable with respect to letters of credit drawn down prior to the Closing) from third parties, together with any unpaid financing charges accrued thereon (collectively, "**Accounts Receivable**");

      (b)    all Intellectual Property, including all rights of action arising from Intellectual Property, including claims for damages by reasons of infringement, and all present and future rights to sue and collect damages or seek injunctive relief for any such infringement;

      (c)    all PP&E, including, without limitation, all assets identified on **Schedule 2.1(c)**;

      (d)    all causes of action, rights of recovery, rights under warranties and guaranties, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), and the right to receive and retain mail, Accounts Receivable payments and other communications of Seller;

      (e)    all Owned Real Property together with all interests in and to all Improvements and fixtures located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

      (f)    all rights under all non-disclosure agreements previously signed with prospective buyers for Seller's assets and Business;

      (g)    all Permits to the extent transferable;

      (h)    any Claim, right or interest in and to all (or the benefit of all to the extent not assignable) Tax refunds, rebates, abatements, credits and similar items of Seller relating to any period, or portion of any period, beginning on or after the Closing Date, to the extent relating to the Business and/or the Acquired Assets post-Closing;

      (i)    all rights, remedies, and benefits under or pursuant to all warranties, representations and guarantees made by vendors, suppliers, manufacturers, contractors and any other Person to the extent relating to products sold, or services provided, to Seller or to the extent related in any way to the Acquired Assets or the Assumed Liabilities;

      (j)    all information, files, records, correspondence, data, plans, manuals, recorded knowledge, including customer and supply lists, sales and promotional materials, catalogues and advertising literature;

      (k)    telephone, email addresses, and fax numbers;

      (l)    all goodwill, choses in action, causes of action, judgments, actions, claims and rights of any kind as against others (whether by contract or otherwise);

(m)     all of Seller's books and records in the Seller's possession or located at the Owned Real Property, including hard copies and electronically stored books and records, or documents contained in the data room provided to Buyer including, without limitation, all books of account; provided, however, that Buyer shall preserve all books and records and similar financial and other records relating to business books and records, operating data and plans, together with all files, contracts, instruments and other documents pertaining to Seller's Business or the Acquired Assets, and Seller shall have the right of reasonable access to and examination of such books and records, including the right to make copies thereof, for a period of three (3) years after the Closing Date upon reasonable notice to Buyer and during normal business hours; provided further, that upon Buyer's reasonable request, Seller shall provide Buyer reasonable access to the Tax Returns, Tax books and records and similar financial and other records of Seller to the extent they are reasonably relevant to Buyer or pertain to the Acquired Assets as reasonably redacted by Seller;

(n)     all of Seller's rights to receive refunds, payments or overpayments, clawbacks or other amounts (whether from a workers' compensation administrator or otherwise) in respect of any and all workers' compensation matters, claims, potential claims, purported claims and similar related items; and

(o)     all insurance policies and benefits, including insurance rights and proceeds and including any accounts receivable credit insurance policy, rights and proceeds.

2.2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed an agreement by Seller to sell, transfer, assign or convey any of the following (the "**Excluded Assets**") to Buyer, and Seller shall retain all right, title and interest to, in and under, and all obligations with respect to, the Excluded Assets:

(a)     all Cash

(b)     all deposits (including, without limitation, customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, prepayments, rights in respect of promotional allowances, vendor rebates and other refunds;

(c)     Cash held in escrow by Utica Leaseco, LLC in the approximate amount of $415,000;

(d)     the rights of Seller under this Agreement and the Ancillary Agreements and all Cash and non-Cash consideration payable or deliverable to Seller under this Agreement;

(e)     all rights under or arising out of insurance policies not relating to the Acquired Assets, (ii) all insurance proceeds received or to become due in connection with such rights, and (iii) all business interruption insurance proceeds;

(f)     all current and prior director and officer insurance policies of Seller and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(g)     all Contracts;

(h)     all Employee Benefit Plans and all trust funds and Contracts related thereto; and

(i)     documents prepared in connection with this Agreement or the transactions contemplated hereby or relating to the Bankruptcy Case.

2.3     <u>Assumption of Liabilities</u>.  Buyer shall, effective at the time of the Closing, assume and agree to discharge and perform when due, solely the following liabilities of Seller (the "**Assumed Liabilities**"):

(a)     all Liabilities arising out of the operation or ownership of the Acquired Assets first arising during, and related to, any period following the Closing Date, but excluding, for the avoidance of doubt, any and all liabilities or obligations of any nature, whether due or to become due, whether accrued, absolute, contingent or otherwise, whether or not existing on the Closing Date, arising out of any transactions entered into or any state of facts existing, or the use, ownership, possession or operation of the Acquired Assets or the conduct of the Business prior to the Closing Date; and

(b)     all Tax liabilities relating to the Acquired Assets for a Tax period (or portion thereof) beginning on or after the Closing Date, but excluding (i) all income Tax liabilities of Seller for any Tax period, and (ii) any Transaction Taxes (which shall be governed by <u>Section 7.1(a)</u>).

2.4     <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary in this Agreement, Buyer shall not assume, be deemed to have assumed, or otherwise be responsible or liable for, any of the following liabilities of Seller (the "**Excluded Liabilities**"):

(a)     any and all Liabilities for Taxes of Seller or any of its Affiliates or any shareholder or equity owner of Seller for which such Seller or Affiliate may be liable, including any Taxes that become a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law), but excluding (i) those expressly assumed by Buyer in <u>Section 2.3(b)</u>, and (ii) any Transaction Taxes (which shall be governed by <u>Section 7.1(a)</u>);

(b)     any Debt;

(c)     any pre-Closing litigation claim or assessment, breach of Contract, tort, infringement, violation of Law by Seller or any of its Affiliates arising from any facts, events or circumstances arising on or prior to the Closing Date, in each case, of any kind or nature whatsoever and whether related to the Acquired Assets or the Business or otherwise and regardless of when commenced;

(d)     any and all Liabilities (i) that are the subject of any dispute, litigation, arbitration, judgment, order, decree or other proceeding as of the Closing Date, (ii) with respect to periods prior to the Closing Date that are or could be asserted as a claim in litigation or arbitration after the Closing Date, or (iii) arising as a result of actions or omissions with respect to services provided to any Person prior to the Closing, except to the extent that any of the foregoing relates to any of the liabilities or obligations expressly enumerated in <u>Section 2.3</u>;

6

(e)    any Liability of Seller arising out of the ownership or operation of an Excluded Asset, including, for the avoidance of doubt, any Liability with respect to Employee Benefit Plans and those Contracts and Permits that constitute Excluded Assets;

(f)    any Liability of Seller or any of its ERISA Affiliates under Title IV of ERISA;

(g)    any Liability of Seller or any of its ERISA Affiliates under COBRA;

(h)    any pension or retirement Liability of Seller to its current or former employees that are accrued as of the Closing Date, whether or not under any Employee Plan;

(i)    any Liability with respect to any costs and expenses (including all legal, accounting, financial advisory, valuation, investment banking and other third-party advisory or consulting fees and expenses) incurred by or on behalf of Seller or any Affiliates of Seller in connection with the Bankruptcy Case or the transactions contemplated by this Agreement;

(j)    any Liability (i) existing prior to the filing of the Bankruptcy Case that is subject to compromise under the Bankruptcy Case, and (ii) to the extent not otherwise expressly assumed herein, incurred subsequent to the filing of the Bankruptcy Case and prior to the Closing;

(k)    any Liability or amounts payable to any security holder of Seller or any of its Affiliates;

(l)    any Liability of Seller arising out of the Agreement or any Ancillary Agreement;

(m)    any and all Liabilities of Seller to any Employee; and

(n)    any Liability not specified as an Assumed Liability.

## ARTICLE 3
## CONSIDERATION

3.1    Purchase Price.  In consideration of the sale of the Acquired Assets to Buyer, and upon the terms and subject to the conditions set forth herein, the aggregate purchase price (the "**Purchase Price**") to be paid by Buyer to Seller for the Acquired Assets is (i) $3,999,999.99 *plus* (ii) the assumption by Buyer of the Assumed Liabilities.

3.2    Purchase Price Deposit.

(a)    On October 12, 2018, Buyer deposited with Seller, pursuant to Section 3.2(b), by wire transfer of immediately available funds, an amount equal to $300,000 (the "**Deposit**"). The Deposit shall be deposited in a non-interest bearing account maintained by the Escrow Agent (as defined below) and be distributed as follows:

(i)    upon the Closing, the Deposit shall be delivered to Seller as partial consideration for the Purchased Assets;

7

(ii)    if this Agreement is terminated by Seller pursuant to <u>Section 11.1(d)</u>, the Deposit shall be delivered to Seller; and

(iii)    if this Agreement is terminated pursuant to ARTICLE 11 for any reason other than as described in <u>Section 3.2(a)(ii)</u>, the Deposit shall be returned to Buyer immediately after such termination, and in no event later than three (3) Business Days after such termination.

(b)    <u>Deposit Terms</u>.

(i)    The Deposit shall be held in escrow in a non-interest bearing account with Equity Partners HG, LLC (the "**Escrow Agent**") pending the disbursement of such Deposit in accordance with the terms of this Agreement.

(ii)    Escrow Agent shall disburse amounts from the Deposit if any, upon delivery by Seller and Buyer to Escrow Agent, of joint written instructions executed by an authorized officer of Buyer and Seller directing Escrow Agent to deliver to Seller or Buyer, as the case may be, an amount equal to the amount to which it is entitled.  Upon receipt of the joint written instructions, Escrow Agent shall release by wire transfer to an account or accounts designated by Seller or Buyer, as the case may be, the amount specified in the joint written instructions.

(iii)    Notwithstanding anything to the contrary contained in this Agreement, in the event of a dispute concerning the Deposit, the Escrow Agent shall not disburse any amounts from the Deposit until its receipt of joint written instructions from Seller and Buyer as set forth hereinabove or an Order of a court of competent jurisdiction directing the disbursement of the Deposit.

3.3    <u>Allocation of Purchase Price</u>.

(a)    Within 10 days before the Closing Date, Buyer shall deliver to Seller for Seller's review and approval (not to be unreasonably withheld, conditioned, delayed or denied) a statement (the "**Allocation Statement**") allocating, for tax purposes, the Purchase Price and any other items that are treated as additional purchase price for tax purposes among the Acquired Assets.  The Allocation Statement shall be reasonable and prepared in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder.

(b)    The Parties hereby agree to (i) be bound by the Allocation Statement, (ii) act in accordance with the Allocation Statement in connection with the preparation, filing and audit of any Tax Return (including, without limitation, in the filing of IRS Form 8594 and any other corresponding Tax forms), and (iii) take no position inconsistent with the Allocation Statement for any Tax purpose (including, without limitation, in any audit, judicial or administrative proceeding) unless otherwise required by applicable law or pursuant to the good faith resolution of a tax contest.

3.4    <u>Withholding Tax</u>.  Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law. All such withheld amounts shall be treated as delivered to Seller hereunder.

# ARTICLE 4
# REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the schedules delivered by Seller herewith (the "**Disclosure Schedules**"), which Disclosure Schedules shall be deemed a part hereof and shall qualify any representation made herein to the extent of the disclosure contained in the corresponding section of the Disclosure Schedules, Seller hereby represents and warrants to Buyer, to the best of Seller's knowledge, to the extent not (i) otherwise known or disclosed to Buyer, (ii) set forth in the documents in the data room provided to Buyer or (iii) set forth in the documents located at the Owned Real Property, as follows:

4.1    Organization; Standing and Power.  Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Nevada (and Mississippi, with respect to Hickory Leasing LLC).  Seller has all requisite corporate power and authority to own, lease and, subject to the provisions of the Bankruptcy Code applicable to debtors in possession, operate its properties, and to carry on the Business as now being conducted by Seller. Subject to entry of the Sale Order, Seller has the power and authority to execute, deliver and perform this Agreement and all writings relating hereto.  Except as a result of the commencement of the Bankruptcy Case, Seller is qualified to do Business and is in good standing in each jurisdiction where the character of the Business or nature of its owned property operated in connection with the Business makes such qualification necessary, except for such failure to be so qualified or in good standing as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Business, taken as a whole.

4.2    Validity and Execution.  The execution, delivery and performance of this Agreement by Seller and the consummation by Seller of the transactions contemplated herein have been duly and validly authorized by all required corporate action in respect thereof.  This Agreement has been duly executed and delivered by Seller, and each other Ancillary Agreement to which Seller is a party will be duly and validly executed and delivered by Seller at the Closing and, subject to requisite Bankruptcy Court approval, will constitute the valid and binding obligations of Seller enforceable against it in accordance with their respective terms.

4.3    No Conflicts.  Subject to the entry of the Sale Order, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Seller will not:  (i) conflict with or result in a breach of the certificate of organization or operating agreement of Seller; (ii) violate any Law applicable to Seller, or (iii) violate or conflict with or constitute a default under any Contract to which Seller is a party or by which Seller or its assets or properties may be bound; except in the cases of clauses (ii) and (iii) above, such violations, conflicts or defaults as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Business, taken as a whole.

4.4    Title to and Use of Acquired Assets.  Seller owns all of the Acquired Assets, and, upon Closing, Buyer will be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good and valid title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than Assumed Liabilities and Permitted Liens, and subject to the limitation that certain transfers, assignments, licenses, leases and Permits, and any claim or right or benefit arising thereunder or resulting therefrom, may require the consent of a third party or Governmental Authority, which has not been obtained ("Consents").  Seller is not aware of any fact or circumstance that would prevent or delay any Consent.  The Acquired Assets constitute all physical assets required for Buyer to operate the Business after Closing.

9

4.5    Real Property.  Except for the Owned Real Property, Seller does not own any real property, and no other real property is required for, or useful in, the conduct of the Business.

4.6    Permits.  Seller holds all Permits necessary to carry on the Business in the ordinary course of business or to own or lease any of its property or assets utilized by it as such property or assets are currently owned, leased or utilized, except to the extent that the failure to hold such Permits (individually or in the aggregate) would not reasonably be expected to have a material adverse effect on the Business or ability to operate the Business, taken as a whole.  To the knowledge of Seller, Seller is not in default or breach of any Permit material to the Business and no proceeding is pending or threatened to revoke or limit any Permit material to the Business.

4.7    Labor Matters.  Seller is not a party to or bound by, and has no obligation to perform (including make payments) under, any labor or collective bargaining agreement or any Contract with a labor union or labor organization.  Seller has no Liabilities owed to present or former employees.

4.8    Environmental Matters.

(a)    Seller has advised Buyer that the Title V permit for the facility has not been issued and has advised Buyer to discuss the history of all environmental matters at the plant with the Mississippi Department of Environmental Quality.  All of the following representations and warranties in this Section 4.8 are limited by the actual information and knowledge available from the Mississippi Department of Environmental Quality.

(b)    Seller has at all times complied and their Business has been conducted, and the Acquired Assets have at all times complied and been used, in full compliance with all applicable Environmental Laws, which compliance includes the possession of and compliance with the terms and conditions of any Environmental Permits.  All of such Environmental Permits are set forth on **Schedule 4.8(a)**.  Seller agrees to cooperate with Buyer in the completion of all activities necessary to effect the transfer of all Environmental Permits from Seller to Buyer;

(c)    Seller has not received any written Environmental Claim and there is no threatened Environmental Claim (a) against Seller, (b) against any Person whose liability for Environmental Claims Seller may have assumed contractually or by operation of law, or (c) relating to the Business or the operation or use of the Acquired Assets, and no facts, circumstances or conditions exist that could give rise to any such Environmental Claim;

(d)    there is no Environmental Condition at, under, in the vicinity of or emanating from, any Owned Real Property;

(e)    (i) Seller has not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or released any substance, including, without limitation, any Hazardous Materials, or owned or operated Owned Real Property in such manner as have given or would give rise to any Liabilities (contingent or otherwise) or investigative, corrective or remedial obligations, pursuant to CERCLA or any other Environmental Laws; (ii) Seller shall not seek contribution costs from Buyer in the event that corrective or remedial obligations, pursuant to CERCLA or any other Environmental Laws, are imposed upon Seller or its Affiliates; (iii) there are no underground storage tanks at the Owned Real Property; (iv) there has been no clean-up of Hazardous Materials at any Owned Real Property or any other property currently occupied or utilized by Seller or

10

its Affiliates in the conduct of the Business or the use of the Acquired Assets; (v) there is not constructed, placed, deposited, Released, stored, disposed, leaching nor located on the Owned Real Property any polychlorinated biphenyls ("**PCBs**") or transformers (except for two pad-mounted transformers), capacitors, ballasts, or other equipment that contain dielectric fluid containing PCBs, or any insulating material containing urea formaldehydes; and (vi) no Environmental Lien or land use limitation has attached to the Owned Real Property or any other property now or formerly operated or used in connection with the Business and/or the Acquired Assets or otherwise by Seller or its Affiliates;

(f)    Seller has not entered into any consent order or other similar agreement with any Governmental Authority that imposes obligations under Environmental Laws on Seller or its Affiliates;

(g)    Seller has not either expressly or by operation of Law, assumed or undertaken any Liability, including, without limitation, any obligation for corrective or Remedial Action, of any other Person relating to Environmental Laws;

(h)    none of the Owned Real Property or any other property now operated or used in connection with the Business and/or the Acquired Assets or otherwise by Seller is listed or proposed for listing on the National Priorities List pursuant to CERCLA, or listed on the Comprehensive Environmental Response Compensation Liability Information System List, or any similar state list of sites and no condition at such properties exists that, if known to a Governmental Authority, would qualify such property for inclusion on any such list;

(i)    neither this Agreement nor the consummation of the transactions that are contemplated herein nor the conduct of the Business will result in any obligations for site investigation or cleanup, or consent to or of any Governmental Authority or third party, pursuant to any of the so called "transaction triggered" or "responsible property transfer" Environmental Laws or any other Environmental Law; and

(j)    Seller has made available to Buyer all environmental audits, investigations, reports, permits, registrations and other material environmental documents relating to Seller that relate to the Owned Real Property, the Business or otherwise that are in the possession of Seller or its respective environmental consultants and attorneys.

4.9    <u>Tax Matters</u>.  Except as disclosed in the Debtor's schedules and statements, and the 2018 taxes as disclosed in subsequent Bankruptcy Court filings:

(a)    All Tax Returns with respect to the Business required to be filed by Seller for any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date have been, or will be, timely filed.

(b)    Seller has withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any Employee, creditor, customer, shareholder or other party, and complied with all information reporting and backup withholding provisions of applicable Law.

(c)    No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller.

11

(d)      All deficiencies asserted, or assessments made, against Seller as a result of any examinations by any taxing authority have been fully paid.

(e)      There are no Encumbrances for Taxes upon any of the Acquired Assets nor, to Seller's knowledge, is any taxing authority in the process of imposing any Encumbrances for Taxes on any of the Acquired Assets (other than for current Taxes not yet due and payable).

(f)      Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

4.10    <u>Insurance</u>.  Seller maintains certain property casualty and liability insurance policies. Such policies are in full force and effect and Seller has paid all premiums on such policies due and payable prior to the Execution Date.

4.11    <u>Litigation; Proceedings</u>.   Except for the Bankruptcy Case and any and all Actions arising therefrom or related thereto and Seller's objection to the taxes assed by Clarke County for the 2016 tax year, there is no Action pending against Seller.

4.12    <u>Compliance with Laws</u>.  Seller has materially complied with, is in compliance with and has operated the Business in compliance with all applicable Laws and Permits, and Seller has not received any written notice or other written communication from any Governmental Authority or other Person (i) asserting any violation of, or failure to comply with, any requirement of any such Law or Permit or (ii) notifying Seller of the non-renewal, revocation or withdrawal of any such Permit.

4.13    <u>Due Diligence Materials.</u>  All materials furnished by or on behalf of Seller to Buyer as part of due diligence or otherwise as an inducement for Buyer to consummate the transactions contemplated herein are true and correct copies and complete in all material respects.

4.14    <u>Warranties Are Exclusive</u>.   EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER SELLER NOR ANY AFFILIATE OF SELLER HAS MADE OR MAKES ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY MATTER RELATING TO ITS ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR OPERATIONS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE ACQUIRED ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

## ARTICLE 5
## <u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

Buyer represents and warrants to Seller as follows:

5.1     <u>Organization, Standing and Power</u>.  Buyer is duly organized, validly existing and in good standing under the laws of the Mohegan Tribe.  Buyer has all requisite entity power and authority to execute, deliver and perform this Agreement and all writings relating hereto.

5.2    <u>Authorization and Validity</u>.    The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all required corporate action in respect thereof.  This Agreement has been duly executed and delivered by Buyer, and each other Ancillary Agreement to which Buyer is a party will be duly and validly executed and delivered by Buyer at the Closing and will constitute the valid and binding obligations of Buyer enforceable against it in accordance with their respective terms.

5.3    <u>No Conflicts</u>.    The consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer will not: (i) conflict with or result in a breach of the certificate of incorporation or bylaws of Buyer; (ii) violate any Law, or (iii) violate or conflict with or constitute a default under any Contract to which Buyer is a party or by which Buyer or its assets or properties may be bound.

5.4    <u>No Brokers or Finders</u>.    No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Buyer in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions for which Seller will be responsible.

5.5    <u>No Other Representations and Warranties</u>.    Except for the representations and warranties contained in this ARTICLE 5, neither Buyer nor any other Person authorized by Buyer makes any other express or implied representation or warranty on behalf of Buyer.

**ARTICLE 6**
**COVENANTS AND OTHER AGREEMENTS**

6.1    <u>Commercially Reasonable Efforts</u>.    Prior to the Closing, each Party shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including to (i) obtain any other consents or approvals as are necessary in connection with the consummation of the transactions contemplated hereby, (ii) effect all registrations and filings as are necessary or desirable in connection with the consummation of the transactions contemplated hereby, (iii) defend any lawsuits or other legal proceedings, whether judicial or administrative, whether brought by private parties or Governmental Authorities or officials, challenging this Agreement or the consummation of the transactions contemplated hereby, and (iv) furnish to each other such information and assistance and to consult with each other with respect to the terms of any registration, filing, application or undertaking as may be reasonably requested in connection with the foregoing.  The Parties shall not willfully take any action that has, or is reasonably likely to have, the effect of delaying, impairing or impeding the receipt of any such required consents, authorizations, orders and approvals.  Notwithstanding the foregoing, the Parties recognize that Seller is administratively insolvent.

6.2    <u>Access to Records and Properties</u>.    Prior to the Closing, Seller shall (i) provide Buyer and its officers, attorneys, accountants, and other authorized representatives reasonable access, during normal Business hours upon reasonable notice, to the facilities, offices and personnel of Seller, the books and records of Seller, the Acquired Assets, and all information reasonably requested by Buyer with respect to any Contract so as to afford Buyer a full opportunity to make such review, examination, and investigation of the Acquired Assets and Contracts as Buyer determines is

13

reasonably necessary in connection with the consummation of the transactions contemplated hereby, (ii) permit Buyer to contact the vendors, manufacturers, suppliers, contractors, licensors, customers and others having Business relations with Seller and, as reasonably requested by Buyer from time to time, use reasonable efforts to facilitate such contacts by Buyer, (iii) furnish Buyer with such financial and operating data and other information with respect to the condition (financial or otherwise), Businesses, assets, properties, prospects or operations of Seller as Buyer shall reasonably request, and (iv) permit Buyer to make such reasonable inspections and copies thereof as Buyer may require; provided, however, Buyer shall use reasonable efforts to prevent any such inspection from unreasonably interfering with the operation of the Business or the duties of any employee of Seller. Notwithstanding anything in this Agreement or in any Ancillary Agreement to the contrary, no such access, information or cooperation shall be permitted or required to the extent that it would require Seller to disclose information subject to attorney-client privilege or would be prohibited by Law.

6.3    Conduct of Business Prior to Closing.    Except as expressly contemplated by this Agreement, except as expressly required under the Bankruptcy Code or other applicable Law or any ruling or order of the Bankruptcy Court and/or except to the extent waived by Buyer's prior written consent, Seller shall (i) not, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Acquired Assets, (ii) not, directly or indirectly, permit, offer, agree or commit to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim, Interest or Encumbrance, except for Permitted Liens, and other than pursuant to the DIP Financing, (iii) taking into account Seller's status as a debtor-in-possession in the Bankruptcy Case, preserve intact the Business, and (vi) not file any motion with the Bankruptcy Court to take any action inconsistent with this Agreement, including, without limitation, this Section 6.3.   Without limiting any Party's rights or obligations under this Agreement, the Parties understand and agree that (A) nothing contained in this Agreement shall give Buyer, directly or indirectly, the power to control or direct the operations of Seller, or the Business prior to the Closing and (B) prior to the Closing, Seller shall exercise consistent with, and subject to the terms and conditions of this Agreement, complete control and supervision of its operations.

6.4    Governmental Authority Matters.    All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of Seller before any Governmental Authority or the staff or regulators of any Governmental Authority, in connection with the transactions contemplated by this Agreement (but, for the avoidance of doubt, not including any disclosure that is not permitted by Law or that would require disclosure by a Party of information subject to the attorney-client privilege) shall be disclosed to Buyer in advance of any filing, submission or attendance, it being the intent that the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals.   Seller shall give notice to Buyer with respect to any meeting, discussion, appearance or contact with any Governmental Authority or the staff or regulators of any Governmental Authority, with such notice being sufficient to provide Buyer with the opportunity to attend and participate in such meeting, discussion, appearance or contact.

6.5    Release of Liens.   As promptly as possible following the date hereof, Seller shall use its commercially reasonable efforts to take any and all actions necessary to permit Buyer to obtain clear title to the Acquired Assets free of all Liens, Claims, Interests, and Encumbrances, other than those specifically agreed to by Buyer in connection with the Assumed Liabilities, and Seller will deliver or

14

cause to be delivered to Buyer termination statements, releases, and other appropriate evidence requested by Buyer to effect that all Liens have been terminated and released prior to Closing.

6.6    <u>Notification</u>.

(a)    Seller shall promptly notify Buyer, and Buyer shall promptly notify Seller, of any litigation, arbitration or administrative proceeding pending or, to their knowledge, threatened against Seller or Buyer, as the case may be, that challenges or would materially affect the transactions contemplated hereby.

(b)    Seller shall provide prompt written notice to Buyer of any change in any of the information contained in the representations and warranties and covenants made by Seller in <u>ARTICLE 4</u> hereof, the due diligence information provided by Seller to Buyer, or any exhibits or schedules referred to herein or attached hereto and shall promptly furnish any information that Buyer may reasonably request in relation to such change; <u>provided</u>, <u>however</u>, that such notice shall not operate to cure any breach of the representations and warranties made by Seller in <u>ARTICLE 4</u> hereof or any exhibits or schedules referred to herein or attached hereto.

(c)    Seller shall promptly notify Buyer, and Buyer shall promptly notify Seller, of the actual or prospective occurrence of a Material Adverse Effect.

6.7    <u>No Inconsistent Action</u>.    Neither Buyer nor Seller shall take any action that is materially inconsistent with its obligations under this Agreement.

6.8    <u>Bankruptcy Matters</u>.  Seller shall use its best efforts to satisfy all of the conditions stated in Section 9.2.

6.9    <u>Insurance</u>.    Seller shall maintain in full force and effect insurance covering the Acquired Assets through the Closing Date.

## ARTICLE 7
## <u>TAXES</u>

7.1    <u>Taxes Related to Purchase of Acquired Assets</u>.

(a)    Buyer shall be responsible for and timely pay all transfer, sales, use, conveyance, recording and similar Taxes, including all such state and local Taxes, incurred in connection with the transfer of the Acquired Assets, and all recording and filing fees (collectively, "**Transaction Taxes**"), that are imposed solely as a result of the sale, transfer, assignment and delivery of the Acquired Assets.  Notwithstanding the time period in <u>Section 3.3(a)</u> relating to the Allocation Statement, Buyer and Seller shall cooperate to (i) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, and (ii) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.  Buyer and Seller shall cooperate in providing each other with any appropriate certification and other similar documentation relating to any exemption from Transaction Taxes (including any appropriate resale exemption certifications), as provided under applicable Law.

(b)    Subject to <u>Section 7.1(a)</u>, on the Closing Date, Seller shall be solely responsible for all sales Taxes, use Taxes, payroll Taxes, and other Taxes that are then due and owing

15

by Seller with respect to the Acquired Assets and the Business and are attributable to Tax periods or portions thereof commencing on or after the Petition Date and ending on the Closing Date; provided, however, Seller shall not be obligated to pay any such Tax that is disputed in good faith by Seller, as long as appropriate reserves have been established in accordance with GAAP.  Subject to Section 7.1(a), all sales Taxes, use Taxes, payroll Taxes, real property Taxes, personal property Taxes and other ad valorem Taxes with respect to the Acquired Assets that accrue during, or are attributable to, the period on or prior to the Closing Date shall remain an obligation of Seller.  All sales Taxes, use Taxes, payroll Taxes, real property Taxes, personal property Taxes and other ad valorem Taxes with respect to the Acquired Assets that both accrue and are due after the Closing Date shall be paid by Buyer.  For purposes of this Agreement, whenever it is necessary to determine the liability for any such Taxes subject to this Section 7.1(b) for a taxable period that begins before the Closing Date and ends after the Closing Date (a "**Straddle Period**"), the Taxes for the portion of the Straddle Period ending on and including the date immediately prior to the Closing Date, which Seller shall pay, and for the portion of the Straddle Period beginning on the Closing Date, which Buyer shall pay, shall be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of calendar days during the Straddle Period before and including the date immediately prior to the Closing Date, or the number of calendar days during the Straddle Period beginning on the Closing Date, as applicable, and the denominator of which is the number of calendar days in the entire Straddle Period.  Buyer and Seller shall cooperate and prepare and file any and all required Tax Returns with respect to Taxes subject to this Section 7.1(b).  To the extent that Buyer pays any amount of Taxes apportioned to the portion of the applicable Straddle Period ending on the Closing Date, Seller shall reimburse Buyer within thirty (30) days after a written request delivered by Buyer to Seller for such portion of such Taxes. To the extent that Seller pays any amount of Taxes apportioned to the portion of the applicable Straddle Period beginning on the day after the Closing Date, Buyer shall reimburse Seller within thirty (30) days after a written request delivered by Seller to Buyer for such portion of such Taxes.

      7.2     <u>Waiver of Bulk Sales Laws</u>.  To the greatest extent permitted by applicable Law, Buyer and Seller hereby waive compliance with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement.  Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any and all Encumbrances, other than Permitted Encumbrances, in each case pursuant to Section 363(f) of the Bankruptcy Code, whether arising prior to or subsequent to the date on which the Bankruptcy Case was commenced, including any Liens or claims arising out of the "bulk-transfer" Laws.

## ARTICLE 8
## BANKRUPTCY COURT MATTERS

      8.1     <u>Consultation with Buyer</u>.  Except to the extent filings must be made on an emergency basis in the reasonable judgment of Seller, Seller shall provide Buyer a draft of any motions, orders or other pleadings that Seller proposes to file with the Bankruptcy Court related in any way to this Agreement or the transactions contemplated herein, including the motion to approve the Sale Order, no later than three (3) Business Days prior to the filing thereof with the Bankruptcy Court.  All such motions, orders, and other pleadings shall be filed by Seller only in a form that is reasonably acceptable to Buyer.

## ARTICLE 9
## CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES

9.1     Conditions Precedent to Performance by Seller.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 9.1(c) and Section 9.1(d), except as expressly provided therein) may be waived by Seller, in its sole and absolute discretion:

(a)     Representations and Warranties of Buyer.  The representations and warranties of Buyer contained in ARTICLE 5 that are not qualified by materiality shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Buyer contained in ARTICLE 5 that are qualified by materiality shall be true and correct in all respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date.

(b)     Performance of the Obligations of Buyer.  Buyer shall have performed and complied in all material respects with all covenants and obligations required under this Agreement to be performed by Buyer on or before the Closing Date (except with respect to obligations that Buyer is to perform as of the Closing under this Agreement (including, without limitation, the obligation to pay the Purchase Price)).

(c)     Bankruptcy Court Approval.  The Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay.

(d)     No Violation of Orders.  No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

For the avoidance of doubt, there shall be no conditions precedent to Seller's obligation to consummate the transactions contemplated by this Agreement, except for those conditions precedent specifically set forth in this Section 9.1.

9.2     Conditions Precedent to the Performance by Buyer.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 9.2(c) and Section 9.2(d), except as expressly provided therein) may be waived by Buyer, in its sole and absolute discretion:

(a)     Representations and Warranties of Seller.  The representations and warranties of Seller contained in ARTICLE 4 that are not qualified by materiality shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Seller contained in ARTICLE 4 that are qualified by materiality shall be true and correct in all respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date.

(b)     Performance of the Obligations of Seller.  Seller shall have performed and complied in all material respects with all covenants and obligations required by Seller under this Agreement that are to be performed by Seller on or before the Closing Date (except with respect to obligations that Seller is to perform as of the Closing under this Agreement).

17

(c)    <u>Bankruptcy Court Approval</u>.

(i)    Each of (A) Hickory Operating 1 LLC; (B) Hickory Operating 2 LLC; (C) Hickory Operating 3 LLC; and (D) Hickory Leasing LLC shall have commenced a chapter 11 bankruptcy case (the "**Additional Bankruptcy Cases**").

(ii)    The Bankruptcy Court shall have entered a final, non-appealable Sale Order in a form acceptable to Buyer in its reasonable discretion, and shall not be subject to a stay.

(iii)    Each Seller shall have provided actual notice of a revised motion to approve the Sale Order, in a form acceptable to Buyer in its reasonable discretion, to all parties in interest in the Bankruptcy Case, as determined by Buyer in its reasonable discretion.

(iv)    The Bankruptcy Court shall have entered a final, non-appealable order, in a form acceptable to Buyer in its sole direction, authorizing Seller's entry into that certain Exclusivity Letter (the "**Exclusivity Letter**"), dated as of the date hereof, with Buyer.

(v)    For purposes of the transactions contemplated hereby only, the Bankruptcy Court shall have entered a final, non-appealable order, in a form acceptable to Buyer in its sole discretion, recharacterizing that certain Master Lease Agreement, dated May 12, 2017, between UTICA Leaseco, LLC, as Lessor, and BTH, as Lessee, (the "**UTICA Lease**") as a disguised secured financing transaction, such that all property subject to the UTICA Lease is deemed property of Seller's bankruptcy estate that may be sold pursuant to Section 363 of the Bankruptcy Code (the "**Recharacterization Order**").  Should the transactions contemplated hereby not close for whatever reason, the recharacterization of the UTICA Lease as a secured financing transaction shall not be binding on UTICA or any other party-in-interest and shall not constitute a judicial determination regarding the characterization of the UTICA Lease.

(d)    <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)    <u>Real Property Survey</u>.  Buyer shall have obtained (at Buyer's expense) an as-built survey of the Owned Real Property, dated not more than three (3) months prior to Closing and prepared by a duly licensed surveyor in the State of Mississippi, and such survey shall not deviate in any material way from the as-built survey of the Owned Real Property that was prepared in or around 2010.

(f)    <u>Delivery of Agreements</u>.  Seller shall have delivered all agreements (including the Ancillary Agreements) required by this Agreement to be delivered to Buyer before the Closing.

(g)    <u>Material Adverse Effect</u>.  At the Closing Date, there is no, and since the date hereof, there has not been a Material Adverse Effect.

For the avoidance of doubt, there shall be no conditions precedent to Buyer's obligation to consummate the transactions contemplated by this Agreement (including any financing or due diligence condition), except for those conditions precedent specifically set forth in this <u>Section 9.2</u>.

18

# ARTICLE 10
# CLOSING AND DELIVERIES

10.1    <u>Closing</u>.    The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place remotely on a Business Day mutually acceptable to the Parties (but as promptly as practicable and in any event no later than November 23, 2018 (the date the Closing occurs being the "**Closing Date**").  The Closing shall be deemed to have occurred as of 12:01 a.m. (Pacific time) on the Closing Date.

10.2    <u>Seller's Deliveries</u>.  At the Closing (or prior thereto), Seller shall:

(a)    deliver and place Buyer in full possession and control of the Acquired Assets;

(b)    execute and deliver to Buyer (i) the Bill of Sale, and (ii) such additional bills of sale, endorsements, assignments and other instruments of transfer and conveyance as may be reasonably requested by Buyer and required under applicable Law to convey valid, marketable title of the Acquired Assets to Buyer free and clear of all Liens, Claims, Interests or Encumbrances (other than Permitted Liens);

(c)    deliver to Buyer a fully executed special warranty deed in a form acceptable to Buyer and sufficient to effect the transfer of the Owned Real Property to Buyer;

(d)    deliver to Buyer fully executed affidavits in the forms attached hereto as Exhibit 10.2(d);

(e)    deliver to Buyer a completed and fully executed Request for Transfer of Permit for the Mississippi Department of Environmental Quality/Office of Pollution Control, in a form acceptable to Buyer and sufficient for Buyer to effect the transfer of the Baseline General Permit, Air Permit to Construct, and Construction General Permit, from Seller;

(f)    deliver an officer's certificate, duly executed by a senior officer of Seller, certifying the matters set forth in <u>Section 9.2(a)</u> and <u>Section 9.2(b)</u>, in a form reasonably satisfactory to Buyer; and

(g)    execute such documents as are necessary to effect the transactions contemplated hereby.

10.3    <u>Buyer's Deliveries</u>.  At the Closing (or prior thereto), Buyer shall:

(a)    pay the Purchase Price, less the amount of the Deposit being released to Seller on the Closing Date pursuant to <u>Section 3.2</u>, by wire transfer of immediately available funds to an account designated by Seller prior to the Closing;

(b)    deliver a certificate, duly executed by a senior officer of Buyer, certifying the matters set forth in <u>Section 9.1(a)</u> and <u>Section 9.1(b)</u> in a form reasonably satisfactory to Seller; and

(c)    execute such documents as are necessary to effect the transactions contemplated hereby.

10.4    <u>Possession</u>.  Right to possession of the Acquired Assets shall transfer to Buyer on the Closing Date.  Seller shall transfer and deliver to Buyer on the Closing Date such keys, locks and safe combinations and other similar items as Buyer may reasonably require to obtain occupation and control of the Acquired Assets, and shall also make available to Buyer at their then existing locations the originals of all documents in Seller's actual possession that are required to be transferred to Buyer by this Agreement.

## ARTICLE 11
## TERMINATION

11.1    <u>Termination</u>.    This Agreement may be terminated only in accordance with this <u>Section 11.1</u>.  This Agreement may be, or, as applicable, shall be, terminated at any time before the Closing as follows:

(a)    by mutual written consent of Seller and Buyer;

(b)    automatically and without any action or notice by Seller to Buyer, or Buyer to Seller, immediately upon:

(i)    the issuance of a final and non-appealable order, decree, or ruling by a Governmental Authority to permanently restrain, enjoin or otherwise prohibit the Closing; or

(ii)    approval by the Bankruptcy Court of an Alternate Transaction.

(c)    by Buyer:

(i)    if the transactions contemplated by this Agreement are not considered a "Qualified Bid" (as such term is defined in the bidding procedures approved by the Bankruptcy Court) within 14 days after the date of this Agreement;

(ii)    if Seller pursues an alternative transaction that in any way conflicts with the transactions contemplated by this Agreement;

(iii)    if the Bankruptcy Court has not entered a final, non-appealable order authorizing Seller's entry into the Exclusivity Letter on or prior to October 22, 2018;

(iv)    if the Additional Bankruptcy Cases have not been commenced on or prior to October 26, 2018;

(v)    if the Recharacterization Order has not been entered on or prior to November 13, 2018;

(vi)    if the Bankruptcy Court has not entered a final, non-appealable Sale Order on or prior to November 13, 2018;

(vii)    if the Closing has not occurred on or prior to the date specified in <u>Section 10.1</u> (the "**Termination Date**"); <u>provided</u>, <u>however</u>, that the Buyer's right to terminate this Agreement shall not be available if Buyer's failure to fulfill any obligation under this Agreement is the cause of, or resulted in, the failure of the Closing to occur on or prior to the Termination Date;

(viii)   if Seller has breached any portion of the Exclusivity Agreement;

(ix)   if Seller has breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the then-applicable Termination Date; provided, however, that (1) Buyer is not in material breach of any of its representations, warranties, covenants or agreements contained herein or in the Sale Order, (2) Buyer notifies Seller in writing of its intention to exercise its rights under this Section (c) as a result of the breach (the "**Buyer Termination Notice**"), and (3) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant or agreement contained herein of which Seller is allegedly in breach; or

(x)   if, prior to the Closing, the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Case or the chapter 11 case of any Seller.

(d)   by Seller, if Buyer has breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the then-applicable Termination Date; provided, however, that (1) Seller is not in material breach of any of its representations, warranties, covenants or agreements contained herein or in the Sale Order, (2) Seller notifies Buyer in writing of its intention to exercise its rights under this Section 11.1(d) as a result of the breach (the "**Seller Termination Notice**"), and (3) Seller specifies in Seller Termination Notice the representation, warranty, covenant or agreement contained herein of which Buyer is allegedly in breach; and

(e)   by Seller if Seller reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided that Seller provide such notice of such determination to the Buyer within one (1) Business Day thereof.

Each condition set forth in this Section 11.1 pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition.  If more than one of the termination conditions set forth in this Section 11.1 is applicable, the applicable Party may choose the termination condition pursuant to which this Agreement is to be terminated.  The Parties acknowledge and agree that no notice of termination or extension of the Termination Date provided pursuant to this Section 11.1 shall become effective until five (5) calendar days after the delivery of such notice to the other parties, and only if such notice shall not have been withdrawn during such five (5) calendar day period or otherwise become invalid.

11.2   Effect of Termination.  In the event of termination pursuant to Section 11.1, this Agreement shall become null and void and have no effect, and no Party shall have any liability to the other Party except (a) nothing herein shall relieve either Party from liability for any breach of this Agreement occurring prior to such termination and (b) with respect to the provisions of ARTICLE 11 and ARTICLE 12, which shall expressly survive termination hereof.

21

# ARTICLE 12
## MISCELLANEOUS

12.1    <u>Survivability of Representations, Warranties, and Covenants</u>.  The representations, warranties, and covenants made by Seller and Buyer in this Agreement will survive without limitation as to time.

12.2    <u>Further Assurances</u>.

(a)    After the Closing, each Party shall, at the request of the other Party, execute and deliver any further instruments or documents and take all such further action as the requesting Party may reasonably request in order to evidence the consummation of the transactions contemplated hereby.

(b)    After the Closing, Seller shall promptly transfer or deliver to Buyer cash, checks (which shall be properly endorsed) or other property that Seller may receive in respect of any deposit, prepaid expense, receivable or other item that constitutes part of the Acquired Assets or relates to the Assumed Liabilities. After the Closing, Buyer shall promptly transfer or deliver to Seller Cash, checks (which shall be properly endorsed) or other property that Buyer may receive in respect of any item that is an Excluded Asset or relates to the Excluded Liabilities.

(c)    From and after the Closing Date, Buyer and Seller shall furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and reasonable assistance relating to the Acquired Assets (including reasonable access to books and records and employees who have direct knowledge regarding the Acquired Assets) as is reasonably necessary for (i) the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax; (ii) winding down Seller's operations, and (iii) any other reasonable business purpose relating to (x) Seller's ownership of the Acquired Assets or the Assumed Liabilities before the Closing or (y) Buyer's ownership of the Acquired Assets or the Assumed Liabilities on and after the Closing.

(d)    After the date hereof, each Seller shall cooperate with Buyer and use its best efforts to effect the transfer of all Permits to Buyer.

12.3    <u>Successors and Assigns</u>.  This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and shall be binding upon the Parties and their respective successors and permitted assigns and any trustee appointed in any of the Bankruptcy Case or subsequent chapter 7 case and Seller, if the Bankruptcy Case is dismissed.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be transferred or assigned (including by operation of Law in connection with a merger or sale of stock, or sale of substantially all the assets, of a Person) by any of the Parties without the prior written consent of the other Party (which consent may be granted, withheld, conditioned or delayed in such other Party's sole and absolute discretion), and any attempted assignment in contravention or breach of the foregoing shall be void and of no force or effect; <u>provided</u>, <u>however</u>, that no consent shall be required in connection with any assignment by any Party of its rights under this Agreement to its lenders or an Affiliate.

12.4    <u>Governing Law; Consent to Jurisdiction</u>.  This Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with the

laws of the State of New York, without regard to the principles of conflicts of law thereof that would defer to the substantive laws of any other jurisdiction. The parties agree that, during the period from the Execution Date until the date on which the Bankruptcy Case is closed or dismissed (the "**Bankruptcy Period**"), the Bankruptcy Court shall have exclusive jurisdiction to resolve any controversy, claim or dispute arising out of or relating to this Agreement or any other agreement entered into in connection herewith. After the Bankruptcy Period, any action or proceeding with respect to such controversy, claim or dispute shall be brought against any of the Parties exclusively in either the United States District Court for the Southern District of New York or any state court of the state of New York, and each Party hereby consents to the personal jurisdiction of such court and the Bankruptcy Court (and to the appropriate appellate courts) in any such action or proceeding and waives any objection, including any objection to the laying of venue or on the grounds of forum non conveniens, which any of them may now or hereafter have to the bringing of such action or proceeding in such respective jurisdictions. Each Party hereby irrevocably consents to the service of process of any of the aforesaid courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the other parties to such action or proceeding. Each Party acknowledges and agrees that any controversy that may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each Party hereby irrevocably waives any right such Party may have to a trial by jury.

12.5    <u>Expenses</u>.  Except as otherwise provided in this Agreement, each Party shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees and commissions or finder's fees, whether or not the transactions contemplated hereby are consummated.

12.6    <u>Severability</u>.  If any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable and the application of any provision so substituted, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Execution Date and (b) the date (if any) this Agreement was last amended.

12.7    <u>Notices</u>.

(a)    All notices, requests, demands, consents, waivers and other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered:  (i) upon receipt, if delivered personally; (ii) when sent, if sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending Party); (iii) on the day of transmission, if sent via electronic transmission to the email address below (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending Party); and (iv) if sent by overnight courier service, one (1) Business Day after deposit with an overnight courier service with next day delivery specified, in each case, properly addressed to the Party to receive the same.  The addresses and facsimile numbers for such communications shall be:

**If to Seller:**

Neal Smaler                                    Kenneth W. Mann
BTH Quitman Hickory                            Equity Partners HG
252 Hickory Street                             16 N. Washington Street, Suite 102
Quitman, Mississippi 39355                     Easton, Maryland 21601

With a copy to:

5530 Corbin Avenue
Suite 362
Tarzana, California 91356

With a copy (which shall not constitute notice) to:

Kevin A. Darby, Esq.
Darby Law Practice, Ltd.
4777 Caughlin Parkway
Reno, Nevada 89519

**If to Buyer:**

Mohegan Renewable Energy (MS), LLC
Attention: Mark D. Boivin
13 Crow Hill Road
Uncasville, Connecticut 06382

With a copy (which shall not constitute notice) to:

McDermott Will & Emery LLP
Attention: Darren Azman
340 Madison Avenue
New York, New York 10173

-and-

The Mohegan Tribe
Attention: Attorney General
13 Crow Hill Road
Uncasville, Connecticut 06382

   (b)  Any Party may change its address, facsimile number or email address for the purpose of this Section 12.7 by giving the other parties written notice of its new address, facsimile number or email address in the manner set forth above. Written confirmation of receipt (i) given by the recipient of such notice, request, demand, consent, waiver or other communication, (ii) mechanically or electronically generated by the sender's facsimile machine containing the time, date and recipient facsimile number or (iii) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively.

12.8    Amendments; Waivers.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Buyer and Seller, or in the case of a waiver, by the Party waiving compliance.  Any waiver by any Party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

12.9    Entire Agreement.   This Agreement, together with the Ancillary Agreements and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein (all of which are hereby incorporated herein by reference), supersede all other prior oral or written agreements among the Parties solely with respect to the matters contained herein and therein, and this Agreement, together with the Ancillary Agreements and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein, contain the entire understanding of the Parties solely with respect to the matters contained herein and therein.  For clarification purposes, the Recitals are part of this Agreement.

12.10    Seller Disclosures.   After notice to and consultation with Buyer, Seller shall be entitled to disclose, if required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Case and other Persons bidding on assets of Seller.  Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Seller shall not issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior written consent of Buyer, which shall not be unreasonably withheld or delayed; provided, however, Seller, without the prior consent of Buyer, may issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law or any Governmental Authority with competent jurisdiction.

12.11    Headings.   The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

12.12    Counterparts.   This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each Party and delivered to each other Party.  In the event that any signature is delivered by facsimile transmission or by an e-mail that contains a portable document format (.pdf) file of an executed signature page, such signature page shall create a valid and binding obligation of the Party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

12.13    Payments and Revenues.  If after the Closing, either Party shall receive any payment, revenue or other amount that belongs to the other Party pursuant to this Agreement, such receiving Party shall promptly remit or cause to be remitted the same to the other Party.

12.14    Specific Enforcement of Covenants.   Seller acknowledges that irreparable damage would occur if any of the covenants and agreements of Seller set forth in this Agreement were not timely performed in accordance with their specific terms or were otherwise breached.  Buyer shall be entitled to an injunction or injunctions to prevent or cure any breach of such covenants and agreements of Seller and to enforce specifically the terms and provisions thereof, this being in addition to any other remedy to which it may be entitled at law or in equity, it being understood that

25

the Bankruptcy Court shall have exclusive jurisdiction over such matters; provided, however, that in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this sentence or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

12.15    Waiver of Jury Trial.    **EACH PARTY HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, RELATING TO OR ARISING OUT OF THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-LAW OR STATUTORY CLAIMS. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT WITHOUT A JURY.**

12.16    No Third Party Beneficiaries.  This Agreement is intended for the benefit of the Parties and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

26

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER:**

MOHEGAN RENEWABLE ENERGY (MS), LLC

By:_____
Name:  Mark D. Boivin
Title:    President

**SELLER:**

BTH QUITMAN HICKORY LLC

By: BTH Quitman LLC, Manager

By:_____
Name:  Neal Smaler
Title:  President

HICKORY OPERATING 2, LLC

By:_____
Name:  Neal Smaler
Title:  President

HICKORY LEASING, LLC

By:_____
Name:  Neal Smaler
Title:  President

HICKORY OPERATING 1, LLC

By:_____
Name:  Neal Smaler
Title:  President

HICKORY OPERATING 3, LLC

By:_____
Name:  Neal Smaler
Title:  President

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER:**

MOHEGAN RENEWABLE ENERGY (MS), LLC

By:_____

Name:  Mark D. Boivin
Title:   President

**SELLER:**

BTH QUITMAN HICKORY LLC

By: BTH Quitman LLC, Manager

By:_____
Name:  Neal Smaler
Title:  President

HICKORY OPERATING 2, LLC

By:_____
Name:_____
Title:_____

HICKORY LEASING, LLC

By:_____
Name:_____
Title:_____

HICKORY OPERATING 1, LLC

By:_____
Name:_____
Title:_____

HICKORY OPERATING 3, LLC

By:_____
Name:_____
Title:_____

## Appendix A
## <u>DEFINED TERMS</u>

The following terms have the meanings set forth in the Preamble hereto or the Sections hereof set forth below:

| Definitions | Location |
|---|---|
| "Acquired Assets" | Section 2.1 |
| "Agreement" | Preamble |
| "Allocation Statement" | Section 3.3(a) |
| "Assumed Liabilities" | Section 2.3 |
| "Bankruptcy Case" | Recitals |
| "Bankruptcy Code" | Recitals |
| "Bankruptcy Court" | Recitals |
| "Business" | Recitals |
| "Buyer" | Preamble |
| "Buyer Termination Notice" | Section 11.1(c)(i) |
| "Closing" | Section 10.1 |
| "Closing Date" | Section 10.1 |
| "Deposit" | Section 3.2(a) |
| "Disclosure Schedules" | ARTICLE 4 |
| "Escrow Agent" | Section 3.2(b)(i) |
| "Excluded Assets" | Section 2.2 |
| "Excluded Liabilities" | Section 2.4 |
| "Execution Date" | Preamble |
| "Parties" | Preamble |
| "Purchase Price" | Section 3.1 |
| "Seller" | Preamble |
| "Straddle Period" | Section 7.1(b) |
| "Transaction Taxes" | Section 7.1(a) |
| "UTICA Lease" | Section 9.2(c) |

"**Action**" means any demand, Claim, action, suit or proceeding, arbitral action, litigation, inquiry, criminal prosecution or investigation by or before any Governmental Authority.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, or by contract. For purposes of Section 4.8, the term "Affiliate" also includes any Person that has operated the Business or the Acquired Assets.

"**Alternate Transaction**" means a transaction or series of related transactions pursuant to which Seller, after a good faith determination and after consultation with outside counsel determines that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duty, sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Seller or otherwise), including pursuant to a stand-alone plan of reorganization or refinancing, all or substantially all of the

Acquired Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer.

"**Ancillary Agreement**" means any agreement, exhibit, schedule, statement, document or certificate executed or delivered in accordance with, in connection with or required by this Agreement, and any other agreement or certificate specifically identified as an Ancillary Agreement for purposes of this Agreement.

"**Bill of Sale**" means the Bill of Sale substantially in the form of **Exhibit A**.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in California, Nevada or New York are authorized by Law or other governmental action to close.

"**Cash**" means all cash on hand and in banks, cash equivalents, marketable securities, short-term investments, treasury bills, money orders, checks (including cash in transit, such as checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), checking account balances, escrow accounts and cash set aside as reserves or collateral, instruments for the payment of money, certificates of deposit and other time deposits and letters of credit.

"**Claim**" has the meaning ascribed by Bankruptcy Code §101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at Law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

"**Contract**" means any agreement, contract, lease (including, without limitation, any real or personal property leases), sublease, purchase order, arrangement, license, commitment, insurance policy or other binding arrangement or written understanding, and any amendments, modifications or supplements thereto.

"**Debt**" means all principal, interest, premiums, penalties or other obligations related to (a) all indebtedness of Seller for borrowed money, (b) all obligations (contingent or otherwise) of Seller for the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and consistent with past practice) (including notes payable to Seller of such property or services), (c) all obligations of Seller evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by Seller, (e) all obligations of Seller as lessee or lessees under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (f) all obligations, contingent or otherwise, of Seller under acceptance, letter of credit or similar facilities, (g) all Debt of the type referred to in clauses (a) through (f) above guaranteed directly or indirectly in any manner by Seller, or in effect guaranteed directly or indirectly by Seller through an agreement (w) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (x) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (y) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are

rendered) or (z) otherwise to assure a creditor against loss; provided, however, that such Debt referred under this clause (h) is of the type that would be reflected as debt on a balance sheet prepared in accordance with GAAP, and (i) all accrued but unpaid interest (or interest equivalent) to the date of determination, and all prepayment premiums or penalties payable upon repayment of any items of Debt of the type referred to in clauses (a) through (i) above.

"**DIP Financing**" means the debtor-in-possession financing provided by Heetway, Inc and its affiliates.

"**Documents**" means all files, documents, instruments, papers, books, reports, records, databases, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer and supplier lists, databases and information, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, Web pages, etc.), cost of pricing information, Business plans, quality control records and procedures, blueprints, accounting, legal and tax files (including all related memoranda and analyses therein), all files, customer and supplier files and documents (including credit information), supplier lists, records, literature and correspondence, including materials relating to services, marketing, advertising, promotional materials, Intellectual Property, and other similar materials to the extent related to, used in, held for use in, the Business or the Acquired Assets in each case whether or not in electronic form, but excluding any materials exclusively related to any Excluded Assets, subject to a claim of attorney-client privilege, as well as any documents prepared by Seller in connection with this Agreement, any Ancillary Agreement, or the Bankruptcy Case.

"**Employee Benefit Plans**" means all (a) "employee pension benefit plans," as defined in Section 3(2) of ERISA, (b) "employee benefit plans," as defined in Section 3(3) of ERISA, (c) employee welfare benefit plans as defined in Section 3(1) of ERISA, and (d) stock option, bonus, deferred compensation, retention, severance, or termination pay plans or policies or any other plans or policies providing for compensation or benefits (including any employment, severance, change in control or similar agreement or any arrangement relating to a sale of the Business or the Acquired Assets), in each case, that is maintained, administered, or contributed to (or with respect to which any obligation to contribute has been undertaken) by Seller and that covers any current or former employee, director, manager, member, officer or consultant of Seller (or their dependents, spouses or beneficiaries).

"**Employee(s)**" means all individuals employed by Seller in connection with the Business and the Acquired Assets at any time prior to the Closing Date.

"**Encumbrances**" means, to the extent not considered a Lien, any security interest, pledge, hypothecation, mortgage, lien or encumbrance, other than any licenses of Intellectual Property.

"**Environmental Claim**" means any claim, action, complaint, cause of action, citation, order, investigation or notice by any person or entity alleging potential liability (including, without limitation, potential liability for investigatory tests, cleanup costs, governmental response costs, natural resources damages, property damages, diminution in value, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, or release into the environment, of any Hazardous Materials at any location, (b) any Environmental Condition, or (c) any other circumstance forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Environmental Condition**" means a condition of the soil, surface waters, groundwater, stream sediments, air and/or similar environmental media including any Release or threatened Release of Hazardous Materials, either on or off a property resulting from any activity, inactivity or operations occurring on such property, that (i) by virtue of Environmental Laws, (x) requires investigatory, corrective or remedial measures, (y) comprises a basis for claims against, demands of and/or liabilities of Seller or Buyer or in respect of the Business or the Owned Real Property, or (z) requires reporting to a Governmental Authority; or (ii) involves the presence of any Hazardous Materials in concentrations or quantities exceeding applicable environmental standards.  "Environmental Condition" shall include those conditions identified or discovered before or after the date hereof resulting from any activity, inactivity or operations whatsoever on or before the Closing Date.

"**Environmental Law**" means any and all federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, guidelines, policies or requirements of any Governmental Authority regulating or imposing standards of liability or of conduct (including common law) concerning air, water, solid waste, Hazardous Materials, worker and community right-to-know, hazard communication, noise, resource protection, wetlands, watercourses, health protection or other environmental, health, safety, and land use concerns as may now or at any time hereafter be in effect.

"**Environmental Lien**" means any Lien in favor of any Governmental Authority in connection with any liability under any Environmental Laws, or damage arising from, or costs incurred by, such Governmental Authority in response to a Release or threatened Release.

"**Environmental Permits**" means permits, licenses, registrations and other authorizations issued by any Governmental Authority that are required under Environmental Laws for Seller or its Affiliates to conduct the Business and its related operations.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**GAAP**" means the United States' generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any foreign or United States federal, national, supranational, state, provincial, local court, tribunal, governmental department, agency, board or commission, regulatory or supervisory authority, or other administrative, governmental or quasi-governmental body, subdivision or instrumentality with regulatory power over the Business.

"**Hazardous Materials**" means any petroleum, petroleum products, fuel oil, derivatives of petroleum products or fuel oil, explosives, reactive materials, ignitable materials, corrosive materials, pollutants, contaminants, hazardous chemicals, hazardous wastes, hazardous substances, extremely hazardous substances, toxic substances, toxic chemicals, radioactive materials, asbestos-containing materials, urea formaldehyde foam insulation, transformers or other equipment that contain polychlorinated biphenyls and radon gas, medical waste, biomedical waste, infectious materials and any other element, compound, mixture, solution or substance that may pose a present or potential hazard to human health or safety or to the environment, including without limitation, any material regulated by or subject to regulation under any Environmental Law.

"**Improvements**" means buildings, structures, systems, facilities, easements, rights-of- way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits belonging, or in any way related, to the Owned Real Property.

"**Intellectual Property**" means all intellectual property, including, without limitation, (a) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, extensions, reexaminations, provisionals, divisions, renewals, revivals, and foreign counterparts thereof and all registrations and renewals in connection therewith, (b) trademarks, service marks, trade dress, logos, trade names and corporate names and other indicia of origin and corporate branding, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) works of authorship, copyrightable works, copyrights and all applications, registrations and renewals in connection therewith, (d) mask works and all applications, registrations and renewals in connection therewith, (e) trade secrets, inventions and confidential Business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, Business and marketing plans and proposals, assembly, test, installation, service and inspection instructions and procedures, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming, service and maintenance notes and logs), (f) Software, (g) internet addresses, uniform resource locaters, domain names, websites and web pages, and (h) any and all other intellectual property and proprietary rights of Seller.

"**Interest**" means "interest" as that term is used in Bankruptcy Code Section 363(f).

"**Law**" means any law, statute, ordinance, regulation, rule, code or rule of common law or otherwise of, or any order (including, without limitation, the Sale Order), judgment, injunction or decree issued, promulgated, enforced or entered by, any Governmental Authority.

"**Liability**" means any debt, loss, liability, Claim, damage, expense, fine, cost, deficiency or obligation, of any nature, whether known or unknown, disclosed or undisclosed, matured or unmatured, determined or undeterminable, on or off balance sheet, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims.

"**Lien**" has the meaning given to that term in the Bankruptcy Code.

"**Material Adverse Effect**" means any one or more state of facts, event, change or effect in or with respect to the Business, the Acquired Assets or the Assumed Liabilities, that results in or could result in, with or without the passage of time, a material adverse effect on the Business or the Acquired Assets, taken as a whole, or a material increase in the amount of the Assumed Liabilities, taken as a whole, other than arising from the commencement of the Bankruptcy Case.

"**Order**" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

"**Ordinary Course of Business**" means the conduct by Seller of the Business in substantially the same manner as conducted as of the date hereof.

"**Owned Real Property**" means the real property located at 250-252 Hickory Street, Quitman, MS 39355 in which Seller has fee title (or equivalent) together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and

items of personal property of Seller attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"**Permits**" means all approvals, permits, registrations, certificates of occupancy or other certificates, concessions, authorizations, grants, easements, variances, exemptions, approvals, consents, orders, franchise, filings, authorizations and licenses.

"**Permitted Liens**" means (a) zoning, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities that do not materially interfere with Buyer's contemplated use of the Acquired Assets, (b) matters that would be disclosed by an accurate survey or inspection of the Owned Real Property that do not materially impair the occupancy or current use of the Owned Real Property that they encumber, and (c) Liens and Encumbrances currently securing the Assumed Liabilities.

"**Person**" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Authority or other entity.

"**Petition Date**" means December 10, 2017.

"**Property Taxes**" means those taxes (currently in dispute) as determined by the Bankruptcy Court to be paid for the period through the Closing Date (2016, 2017 and that portion of 2018 through the Closing Date).

"**PP&E**" means all equipment, machinery, industrial and motor vehicles, fixtures, furniture and other tangible property, including all such property that is damaged and all attachments, appliances, fittings, gas and oil burners, lighting fixtures, signs, doors, cabinets, partitions, mantels, motors, pumps, screens, plumbing, heating, air conditioning, refrigerators, freezers, refrigerating and cooling systems, waste disposal and storing, wiring, telephones, televisions, monitors, security systems, racks, ovens, stoves, carpets, floor coverings, wall coverings, office equipment, kitchen appliances, computers (including point-of-sale terminals and systems), registers and safes, trash containers, meters and scales, combinations, codes and keys, and any other furniture, fixtures, equipment and tangible improvements.

"**Release**" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"**Remedial Action**" means all action to (a) clean up, remove, treat or handle in any other way Hazardous Materials in the environment, (b) prevent the Release of Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or the environment, or (c) perform remedial investigations, feasibility studies, corrective actions, closures and post-remedial or post-closure studies, investigations, operations, maintenance and monitoring.

"**Sale Hearing**" means the hearing to consider the entry of the Sale Order.

"**Sale Order**" means an order issued by the Bankruptcy Court approving this Agreement and the transactions contemplated hereby with only such changes or modifications as are acceptable to Buyer in its sole discretion.

"**Seller Termination Notice**" is defined in Section 11.1(d).

"**Software**" means any computer program, operating system, application, system, firmware or software of any nature, point-of-entry system, peripherals, and data whether operational, active, under development or design, nonoperational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational, devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form, virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature, and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating system, application, system, firmware or software.

"**Tax**" or "**Taxes**" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Governmental Authority, whether payable by reason of Contract, assumption, transferee liability, operation of Law or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law), which taxes shall include all federal, state, local, foreign and other income taxes, payroll and employee withholding, unemployment insurance, severance, social security (or similar), sales and use, excise, ad valorem, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workers' compensation, customs duties, registration, documentary, value-added, profits, license, lease, service, service use, withholding, alternative, windfall profits, add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"**Tax Return**" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes), including any schedule or attachment thereto, and including any amendment thereof.

"**Treasury Regulation**" means, with respect to any referenced provision, such provision of the regulations promulgated by the United States Department of the Treasury.

**Schedule 2.1(c)**

PP&E

BTH QUITMAN HICKORY EQUIPMENT LIST

| Location within Plant | Vendor | Model | ID on PFDs | Year Placed in Service | Machine Description | Clarke County PINN Number | Owner / Secured Party |
|---|---|---|---|---|---|---|---|
| | | | | | NOTE: THE FOLLOWING SCHEDULES WERE PREPARED USING A COMBINATION OF AVAILABLE DOCUMENTS PREPARED BY OTHER PARTIES INCLUDING PRODUCT FLOW DIAGRAMS (PFDs); DOCUMENTS FROM CLARKE COUNTY; UCC FILING; CONTRACTS AND OTHER DOCUMENTATION. SOME OF THE EQUIPMENT PURCHASED IN THE EARLIER YEARS HAD BEEN TAKEN OUT OF SERVICE AND MOST IS STORED IN BUILDING 3 , OR  IF COMPLETELY OBSOLTETE, DAMAGED OR OF NO FURTHER USE MAY HAVE BEEN SCRAPED OR SOLD. THERE MAY BE SOME DISCREPENCIES BETWEEN THE PFDs (WHICH WERE USED AS THE PRIMARY SOURCE IN COMPILING THIS TABLE) AND THE ACTUAL EQUIPMENT IN THE FIELD. HOWEVER, WE BELEIVE THAT THE PFDs IN GENERAL ARE REASONABLY ACCURATE. IT MAY BE USEFUL TO REVIEW THIS TABLE TOGETHER WITH THE PFDs AND ALSO WITH PI&DS ALSO PROVIDED. NEITHER THE DEBTOR NOR ANY OF ITS OFFICERS OR REPRESENTATIVES MAKE ANY WARRANTY OR REPRESENTATION REGARDING THE ACCURACY OF THIS TABLE | | |
| PROCESS FLOW DIAGRAM F-1 and F-2 | | | | | | | |
| | | | | | | | |
| Wood Yard | Alabama Scale Systems | 100 Ton Fairbanks Trident Truck Scale with TensileCore Engineered Concrete | 100-000 | 2014/2015 | Two Truck Scales | 3114 | UTICA |
| | Bruks Rockwood | Bruks 75' Back-On Truck Dump with receiving Hopper | 100-010 | 2014/2015 | Bruks Truck Dumper | 3114 | UTICA |
| | Superior | Superior model 48" x 30' Belt Conveyor & Superior model 48" x 98' Belt Conveyor | 100-010 | 2014/2015 | Dumper Outfeed Conveyors - Superior model 48" x 30' Belt Conveyor & Superior model 48" x 98' Belt Conveyor | 3114 | UTICA |
| | Superior | Superior model 36"x190' portable telestacker ® conveyor | 100-020 | 2014/2015 | Superior model 36"x190' portable telestacker ® conveyor | 3114 | UTICA |
| | | | | | | | |
| Green Chip End | CDM | Hooper with 10 screw live bottom reclaim | 140-010 | 2014/2015 | Green Chip Feed Hopper | 3114 | UTICA |
| | Superior | | 140-020 | 2014/2015 | Incline Belt Conveyor | 3114 | UTICA |
| | Schlagel | 2020 (Galv) | 140-030 | 2014/2015 | Cross Drag Feeder POWERFLOW CONVEYOR 2020 (Galv) x 14'-0" | 3114 | UTICA |
| | Williams Crusher | S/N21456 WDS | 140-040 | 2014/2015 | 48 X 8 Disk Screener | 3114 | UTICA |
| | CDM | | 140-050 | 2014/2015 | Green Chip Transfer Belt Conveyor | 3114 | UTICA |
| | MPI | CBS-130, PM-415-SS, PM-422-SS | 140-060 | 2014/2015 | Cross belt separator, 2 Plate Magnets | 3114 | UTICA |
| | Schlagel | 42208-Galv | 140-065 | 2014/2015 | Green Chip BUCKET ELEVATOR 42208G x 55'-0" D.H. (O.H. = 63'-11") | 3114 | UTICA |
| | BM&M | Model 8X202CS | 140-070 | 2014/2015 | 8' x 20' 2-Deck Chip Screen - Green screen | 3114 | UTICA |
| | Schlagel | 2020 (Galv) | 140-080 | 2014/2015 | Feed to Hammer Hog POWERFLOW CONVEYOR 2020 (Galv) x 50'-0" | 3114 | UTICA |
| | Schlagel | 2020 (Galv) | 140-090 | 2014/2015 | Recycle POWERFLOW CONVEYOR 2020 (Galv) x 70' -0" | 3114 | UTICA |
| | Williams Crusher | Model 50 KS Chip Hog | 140-100 | 2014/2015 | Williams Green Chip Hog | 3114 | UTICA |
| | Williams Crusher | Model 50 KS Chip Hog | 140-110 | 2014/2015 | Williams Green Chip Hog | 3114 | UTICA |

**BTH QUITMAN HICKORY EQUIPMENT LIST**

| Location within Plant | Vendor | Model | ID on PFDs | Year Placed in Service | Machine Description | Clarke County PINN Number | Owner / Secured Party |
|---|---|---|---|---|---|---|---|
| | Schlagel | 2020 (Galv) | 140-120 | 2014/2015 | Hog/Screen Accepts Drag POWERFLOW CONVEYOR 2020 (Galv) x 54' -7 " | 3114 | UTICA |
| | Schlagel | 2020 (Galv) | 140-130 | 2014/2015 | Ground Green Chips Transfer Drag POWERFLOW CONVEYOR 2020 (Galv) x 54'-7" | 3114 | UTICA |
| | Schlagel | 42208-Galv | 140-140 | 2014/2015 | Ground Green Chips to Silo BUCKET ELEVATOR 42208G x 70'-0" D.H. (O.H. = 78'-11") | 3114 | UTICA |
| | Tank Connection | | 140-150 | 2014/2015 | Ground Green Chips Silo | 3114 | UTICA |
| | | | | 2014/2015 | lot Motion sensors | 3114 | UTICA |
| | CDM | | 140-160 | 2014/2015 | Live Bottom Feeder Screw Drive | 3114 | UTICA |
| | CDM | | 140-161 | 2014/2015 | COLLECTION SCREW to Dryer | 3114 | UTICA |
| | CDM | | 140-170 | 2014/2015 | SILO TRANSFER BELT Conveyor | 3114 | UTICA |
| | Thermo Ramsey | 30" MODEL 10-20 | 140-175 | 2014/2015 | SINGLE IDLER BELT SCALE CARRIAGE | 3114 | UTICA |
| | CDM | | 140-180 | 2014/2015 | DRYER TRANSFER LEG FEED BELT | 3114 | UTICA |
| | Schlagel | 42208-Galv | 140-180 | 2014/2015 | BUCKET ELEVATOR 42208G x 70'-0" D.H. (O.H. = 78'-11") | 3114 | UTICA |
| | | | 140-190 | 2014/2015 | Transfer Belt to Dryer Inlet | 3114 | UTICA |
| | CDM | | 140-200 | 2014/2015 | Silo WPS Feeder COLLECTION SCREW | 3114 | UTICA |
| | CDM | | 140-210 | 2014/2015 | Green Chip Transfer Belt | 3114 | UTICA |
| | CDM | | 140-215 | 2014/2015 | Reversing C&F Mixer Bin Fill Screw | 3114 | UTICA |
| | 4-B | WDC3NV46C | 140-150 | 2014/2015 | Watchdog Elite NTC Control Unit | 3114 | UTICA |
| | | | | | | | |
| **Dry Shaving Hopper** | CDM | | 150-010 | 2014/2015 | DUMP HOPPER | 3114 | UTICA |
| | Schlagel | 1214 Galv | 150-020 | 2014/2015 | POWERFLOW CONVEYOR 1214 (Galv) x 52'-0" | 3114 | UTICA |
| | | | | | | | |
| **PROCESS FLOW DIAGRAM F-3** | | | | | | | |
| | | | | | | | |
| **Dryer Island** | TSI | | 200-010 | 2014/2015 | Drum Dryer | 3114 | HICKORY LEASING |
| | TSI | | 200-020 | 2014/2015 | Dryer Burner | 3114 | HICKORY LEASING |
| | TSI | | 200-030 | 2014/2015 | Wood Fuel Bin | 3114 | HICKORY LEASING |
| | TSI | | 200-040 | 2014/2015 | Dry Chip Collection Hopper | 3114 | HICKORY LEASING |
| | TSI | | 200-050 | 2014/2015 | Multiclone | 3114 | HICKORY LEASING |
| | TSI | | 200-060 | 2014/2015 | Cyclone Screw | 3114 | HICKORY LEASING |
| | TSI | | 200-070 | 2014/2015 | Cyclone Fan | 3114 | HICKORY LEASING |
| | TSI | | 200-080 | 2014/2015 | Chip Collection Bin Screw | 3114 | HICKORY LEASING |
| | TSI | | 200-090 | 2014/2015 | Transfer Belt | 3114 | HICKORY LEASING |
| | TSI | | 200-100 | 2014/2015 | Fire Dump Diverter | 3114 | HICKORY LEASING |
| | TSI | | 200-110 | 2014/2015 | Transfer Belt | 3114 | HICKORY LEASING |
| | TSI | | 200-120 | 2014/2015 | Belt Scale | 3114 | HICKORY LEASING |
| | TSI | | 200-130 | 2014/2015 | Dryer Diverter | 3114 | HICKORY LEASING |
| | CDM | | | 2014/2015 | Elevator to Screener | 3114 | HICKORY LEASING |
| | Texas Shaker | | | 2014/2015 | Screener | 3114 | HICKORY LEASING |
| | Bliss | | | 2014/2015 | Hammermill | 3114 | HICKORY LEASING |
| | CDM | | 200-140 | 2014/2015 | Transfer Belt | 3114 | HICKORY LEASING |
| | CDM | | 200-150 | 2014/2015 | Bag Filter | 3114 | HICKORY LEASING |
| | CDM | | 200-160 | 2014/2015 | Bag Filter | 3114 | HICKORY LEASING |

**BTH QUITMAN HICKORY EQUIPMENT LIST**

| Location within Plant | Vendor | Model | ID on PFDs | Year Placed in Service | Machine Description | Clarke County PINN Number | Owner / Secured Party |
|---|---|---|---|---|---|---|---|
| | CDM | | 200-170 | 2014/2015 | ID Fan | 3114 | HICKORY LEASING |
| | CDM | | 200-210 | 2014/2015 | Blower | 3114 | HICKORY LEASING |
| | CDM | | 200-220 | 2014/2015 | Airlock | 3114 | HICKORY LEASING |
| | | | | | | | |
| **PROCESS FLOW DIAGRAM F-4** | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| **Dried Wood Material Handling** | | | | 2014/2015 | | 3114 | UTICA |
| | CDM | | 300-010 | 2014/2015 | DRY CHIPS TRANSFER BELT 1 | 3114 | UTICA |
| | CDM | | 300-015 | 2014/2015 | DRY CHIP TRANSFER BELT 2 | 3114 | UTICA |
| | 4-B | WDC3NV46C | 300-00 | 2014/2015 | Watchdog Elite NTC Control Unit | 3114 | UTICA |
| | CDM | | 300-020 | 2014/2015 | | 3114 | UTICA |
| | CDM | | 300-030 | 2014/2015 | | 3114 | UTICA |
| | CDM | | 300-040 | 2014/2015 | | 3114 | UTICA |
| | CDM | | 300-100 | 2014/2015 | | 3114 | UTICA |
| | CDM | | 300-050 | 2014/2015 | | 3114 | UTICA |
| | CDM | | 300-060 | 2014/2015 | | 3114 | UTICA |
| | CDM | | 300-070 | 2014/2015 | | 3114 | UTICA |
| | | | | | | | |
| **Torrefied Wood Handling** | | | | | | | |
| | | | | 2012 | Discharge Screw from Reactor R5 | | BTHQH |
| | CDM | | 310-010 | 2014/2015 | Reactor Transfer SCREW R5 | 3114 | UTICA |
| | | | | 2012 | Discharge Screw from Reactor R$ | | BTHQH |
| | CDM | | 310-030 | 2014/2015 | Reactor Transfer SCREW R4 | 3114 | UTICA |
| | | | 310-050 | 2014/2015 | Transfer Screw | 3114 | UTICA |
| | | | 310-060 | 2014/2015 | Transfer Screw | 3114 | UTICA |
| | CDM | | 310-070 | 2014/2015 | Transfer Screw to Knife mill | 3114 | UTICA |
| | | | 310-080 | 2014/2015 | Slide gate | 3114 | UTICA |
| | | | 310-100 | 2014/2015 | Knife mill | 3114 | BTHQH |
| | | | 310-110 | 2014/2015 | ID Fan and bag filter | 3114 | UTICA |
| | CDM | | 310-130 | 2014/2015 | Knife Mill Transfer SCREW | 3114 | UTICA |
| | Schlagel | 1075 S.S. | 310-140 | 2014/2015 | BUCKET ELEVATOR 1075S x 85'-0" D.H. (O.H. = 88'-3") | 3114 | UTICA |
| | | | | | | | |
| **Belt conveyor from dry shavings to existing silo** | | | | 2014 | | | |
| | Superior | | 320-010 | 2014/2015 | Dry Transfer Belt Conveyor | 3114 | UTICA |
| | | | | | | | |
| **PROCESS FLOW DIAGRAM F-5** | | | | | | | |
| | | | | | | | |
| **Hammermill System** | | | | | | | |
| | | | 5000-010 | 2012 | Drag Transfer Conveyor | | UTICA |
| | | | 5000-120 | 2012 | Dry Wood Elevator | | UTICA |
| | | | 5000-130 | 2012 | Dry Chip Silo | | UTICA |

**BTH QUITMAN HICKORY EQUIPMENT LIST**

| Location within Plant | Vendor | Model | ID on PFDs | Year Placed in Service | Machine Description | Clarke County PINN Number | Owner / Secured Party |
|---|---|---|---|---|---|---|---|
| | Environmental Pneumatics | Cincinnati PB-15A, EP-SPJ-25-96-BLBV | 5000-130 | 2014/2015 | Bin Vent & Fan | 3114 | UTICA |
| | CDM | | 5000-130 | 2014/2015 | EXPLOSION RELIEF PANELS | 3114 | UTICA |
| | | | 5000-140 | 2012 | Live Bottom Bin Feeder | 2939 | UTICA |
| | | | 5000-150 | 2012 | Live Bottom Bin Feeder | 2939 | UTICA |
| | Schlagel | 1214 Galv | 5000-160 | 2012 | Drag to Hammermill 1 POWERFLOW CONVEYOR 1214 (Galv) x 30'-0" | 2939 | UTICA |
| | CDM | | 5000-161 | 2012 | Manual Diverter | 2939 | UTICA |
| | Schlagel | 36147-Galv | 5000-165 | 2012 | BUCKET ELEVATOR 36147G x 55'-0" D.H. (O.H. = 62'-11") | 2939 | UTICA |
| | | | 5000-170 | 2012 | Hammermill Bin and Feeder Screww | 2939 | UTICA |
| | | | 5000-180 | 2012 | Hammermill | 2939 | UTICA |
| | | | 5000-190 | 2012 | Hammermill Transfer Screw | 2939 | UTICA |
| | | | 5000-200 | 2012 | Air Lock | 2939 | UTICA |
| | Environmental Pneumatics | EP-SPJ-100-120-TLBV & SQBI-40 | 5000-210 | 2012 | Plenum Filter - Round Pulse Jet filter & Fan | 2939 | UTICA |
| | | | | | | | |
| | | | | | | | |
| **Hammermill System** | | | | 2014/2015 | | | |
| | Schlagel | 1214 Galv | 500-060 | 2014/2015 | Drag to Hammermill 2 POWERFLOW CONVEYOR 1214 (Galv) x 30'-0" | 3114 | UTICA |
| | Schlagel | 36147-Galv | 500-065 | 2014/2015 | BUCKET ELEVATOR 36147G x 55'-0" D.H. (O.H. = 62'-11") | 3114 | UTICA |
| | CDM | | 500-170 | 2014/2015 | FEEDER BIN | 3114 | UTICA |
| | CDM | | 500-180 | 2014/2015 | HAMMER MILL, bag filter and Plenum | 3114 | UTICA |
| | CDM | | 500-190 | 2014/2015 | Transfer Screw | 3114 | UTICA |
| | Smoot | Model FT12-1 RT  1 HP | 500-200 | 2014/2015 | Smoot Airlock Valve | 3114 | UTICA |
| | Environmental Pneumatics | EP-SPJ-100-120-TLBV & SQBI-40 | 500-210 | 2014/2015 | Plenum Filter - Round Pulse Jet filter & Fan | 3114 | UTICA |
| | Schlagel | 2020C1-Galv | 500-310 | 2014/2015 | Ground Wood Drag POWERFLOW CONVEYOR 2020C1g (Galv) x 69'-5" O.A. (6 deg curve section) | 3114 | UTICA |
| | | | 500-320 | 2014/2015 | Belt Scale | 3114 | UTICA |
| | Schlagel | I2227 Galv | 500-340 | 2014/2015 | Ground Wood Drag POWERFLOW CONVEYOR I2227 (Galv) x 30'-0" O.A. (14.4 deg incline) | 3114 | UTICA |
| | | | | | | | |
| **PROCESS FLOW DIAGRAM F-6** | | | | | | | |
| | | | | | | | |
| **Tower through Pelleting** | | | | 2014/2015 | | | |
| | Schlagel | 42208-Galv | 600-000 | 2014/2015 | BUCKET ELEVATOR 42208G x 60'-0" D.H. (O.H. = 68'-11") | 3114 | UTICA |
| | Tank Connection | | 600-010 | 2014/2015 | TFW Silo | 3114 | UTICA |
| | Environmental Pneumatics | Cincinnati PB-15A, EP-SPJ-25-96-BLBV | 600-010-01 | 2014/2015 | Bin Vent & Fan | 3114 | UTICA |
| | Tank Connection | | 600-020 | 2014/2015 | Grd White Wood Silo | 3114 | UTICA |

**BTH QUITMAN HICKORY EQUIPMENT LIST**

| Location within Plant | Vendor | Model | ID on PFDs | Year Placed in Service | Machine Description | Clarke County PINN Number | Owner / Secured Party |
|---|---|---|---|---|---|---|---|
| | Environmental Pneumatics | Cincinnati PB-15A, EP-SPJ-25-96-BLBV | 600-020-01 | 2014/2015 | Bin Vent & Fan | 3114 | UTICA |
| | CDM | | 600-025 | 2014/2015 | LIVE BOTTOME FEED SCRW - first set | 3114 | UTICA |
| | | | 600-025 | 2014/2015 | LIVE BOTTOME FEED SCRW - second set | 3114 | UTICA |
| | CDM | | 600-035 | 2014/2015 | REV COLLECT SCREW | 3114 | UTICA |
| | CDM | | | 2014/2015 | Collection All Feeders to one Screw | 3114 | UTICA |
| | CDM | | 600-045 | 2014/2015 | LIVE BOTTOM Bin FEEDER SCRW | 3114 | UTICA |
| | CDM | | 600-055 | 2014/2015 | REV COLLECT SCREW | 3114 | UTICA |
| | Scott | | 600-075 | 2014/2015 | PUG MILL MIXER | 3114 | UTICA |
| | Scott | | 600-090 | 2014/2015 | Twin Motor Mixer | 3114 | UTICA |
| | Scott | | 600-095 | 2014/2015 | Twin Motor Mixer | 3114 | UTICA |
| | CDM | | 600-100 | 2014/2015 | Collection Screw | 3114 | UTICA |
| | Schlagel | 42208-Galv | 600-045 | 2014/2015 | BUCKET ELEVATOR 42208G x 40'-0" D.H. (O.H. = 48'-11") | 3114 | UTICA |
| **Pelleting** | | | | 2014/2015 | | 3114 | UTICA |
| | Schlagel | 2020 (Galv) | 600-060 | 2014/2015 | Pellet mill Feed Drag Conveyor | 3114 | UTICA |
| | Schlagel | 2020 (Galv) | 600-065 | 2014/2015 | Pellet mill Feed Cross Drag Conveyor | 3114 | UTICA |
| | Schlagel | 2020 (Galv) | 600-160 | 2014/2015 | POWERFLOW CONVEYOR 2020 (Galv) x 107'-0" | 3114 | UTICA |
| | Schlagel | | 600-165 | 2014/2015 | DIVERTER GATE | 3114 | UTICA |
| | Schlagel | 2020C1 S.S. | 600-070 | 2014/2015 | Collection Drag POWERFLOW CONVEYOR 2020C1S (S.S.) x 108'-9" O.A. (10 deg curve section) | 3114 | UTICA |
| | | | | | | | UTICA |
| | CDM | | 600-110 | 2014/2015 | PELLET MILL FEED BIN | 3114 | UTICA |
| | CPM | | 600-120 | 2014/2015 | CONDITIONER | 3114 | UTICA |
| | CPM | | 600-130 | 2014/2015 | PELLET MILL WITH Oil cooled rollers | 3114 | UTICA |
| | CDM | | 600-210 | 2014/2015 | PELLET MILL FEED BIN | 3114 | UTICA |
| | CPM | | 600-220 | 2014/2015 | CONDITIONER | 3114 | UTICA |
| | CPM | | 600-230 | 2014/2015 | PELLET MILL WITH Oil cooled rollers | 3114 | UTICA |
| | CDM | | 600-310 | 2014/2015 | PELLET MILL FEED BIN | 3114 | UTICA |
| | CPM | | 600-320 | 2014/2015 | CONDITIONER | 3114 | UTICA |
| | CPM | | 600-330 | 2014/2015 | PELLET MILL WITH Oil cooled rollers | 3114 | UTICA |
| | CDM | | 600-410 | 2014/2015 | PELLET MILL FEED BIN | 3114 | UTICA |
| | CPM | | 600-420 | 2014/2015 | CONDITIONER | 3114 | UTICA |
| | CPM | | 600-430 | 2014/2015 | PELLET MILL WITH Oil cooled rollers | 3114 | UTICA |
| | | | | | | | |
| | | | | | | | |
| | Schlagel | 2020C1 S.S. | 6000-070 | 2014/2015 | POWERFLOW CONVEYOR 2020C1S (S.S.) x 108'-9" O.A. (10 deg curve section) | 3114 | UTICA |
| | CDM | | 6000-110 | 2014/2015 | PELLET MILL FEED BIN | 3114 | UTICA |
| | KAHL | | 6000-120 | 2014/2015 | Conditioner | 3114 | Amandus Kahl |
| | KAHL | | 6000-130 | 2014/2015 | PELLET MILL | 3114 | Amandus Kahl |
| | CDM | | 6000-210 | 2014/2015 | PELLET MILL FEED BIN | 3114 | UTICA |

**BTH QUITMAN HICKORY EQUIPMENT LIST**

| Location within Plant | Vendor | Model | ID on PFDs | Year Placed in Service | Machine Description | Clarke County PINN Number | Owner / Secured Party |
|---|---|---|---|---|---|---|---|
| | KAHL | | 6000-220 | 2014/2015 | Conditioner | 3114 | Amandus Kahl |
| | KAHL | | 6000-230 | 2014/2015 | PELLETT MILL | 3114 | Amandus Kahl |
| | CDM | | 6000-310 | 2014/2015 | PELLET MILL FEED BIN | 3114 | UTICA |
| | KAHL | | 6006-320 | 2014/2015 | Conditioner | 3114 | Amandus Kahl |
| | KAHL | | 6000-330 | 2014/2015 | PELLETT MILL | 3114 | Amandus Kahl |
| | | | | | | | |
| | NOTE: 4 CPM AND 3 KAHL PELLETMILLS WERE INSTALLED. | | | | | | |
| | NOTE: STEAM SYSTEM WAS NOT INSTALLED | | | | | | |
| | | | | | | | |
| | | | | | | | |
| **PROCESS FLOW DIAGRAM F-7** | | | | | | | |
| | | | | | | | |
| **Cooler System** | | | | 2014/2015 | | | |
| | Schlagel | | 800-010 | 2014/2015 | Cooler Infeed BUCKET ELEVATOR 30137G x 30'-0" D.H. (O.H. = 37'-4") | 3114 | UTICA |
| | Schlagel | | 800-011 | 2014/2015 | Diverter Gate / Fire Dump | 3114 | UTICA |
| | Geelen | | 800-020 | 2014/2015 | Cooler | 3114 | UTICA |
| | Schlagel | | 800-030 | 2014/2015 | Pellet Transfer Drag to Screen POWERFLOW CONVEYOR IC2021 (Galv) x 65'-0" O.A. (20 deg incline) | 3114 | UTICA |
| | BM&M | | 800-040 | 2014/2015 | 4' x 10' 1-Deck Super Screen - Pellet Screen | 3114 | UTICA |
| | | | 800-050 | 2014/2015 | Bag Filter | 3114 | UTICA |
| | | | 800-060 | 2014/2015 | ID Fan | 3114 | UTICA |
| | | | 800-070 | 2014/2015 | Airlock | 3114 | UTICA |
| | Smoot | | 800-080 | 2014/2015 | Fines PRESSURE BLOWER 30 HP | 3114 | UTICA |
| | Smoot | | 800-090 | 2014/2015 | Smoot Airlock Valve | 3114 | UTICA |
| | Schlagel | | 8000-010 | 2014/2015 | Cooler Infeed BUCKET ELEVATOR 30137G x 30'-0" D.H. (O.H. = 37'-4") | 3114 | UTICA |
| | CDM | | 8000-011 | 2014/2015 | Diverter Gate / Fire Dump | 3114 | UTICA |
| | Geelen | | 8000-020 | 2014/2015 | Cooler | 3114 | UTICA |
| | Environmental Pneumatics | | 8000-050 | 2011 | Cooler Filter Receiver | 2825 | UTICA |
| | | | 8000-060 | 2011 | ID fan | 2825 | UTICA |
| | | | 8000-070 | 2011 | Air Lock | 2825 | UTICA |
| | Smoot | | 8000-080 | 2011 | Fines Blower | 2825 | UTICA |
| | | | 8000-100 | 2011 | Cooler Transfer Drag | 2825 | UTICA |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| **PROCESS FLOW DIAGRAM F-8** | | | | | | | |
| | | | | | | | |
| **Storage and Load Out System** | | | | | | | |
| | | | 9000-010 | 2011 | Elevator | 2825 | UTICA |
| | | | 9000-020 | 2011 | Loadout Pellet Bin | 2825 | UTICA |
| | | | 9000-030 | 2011 | Drag Conveyor | 2825 | UTICA |

**BTH QUITMAN HICKORY EQUIPMENT LIST**

| Location within Plant | Vendor | Model | ID on PFDs | Year Placed in Service | Machine Description | Clarke County PINN Number | Owner / Secured Party |
|---|---|---|---|---|---|---|---|
| | | | 9000-040 | 2011 | Truck Scale | 2825 | UTICA |
| | | | | | | | UTICA |
| | Schlagel | 2020 (Galv) | 900-010 | 2014/2015 | Transfer Drag 2020 (Galv) | 3114 | HICKORY LEASING |
| | Schlagel | | 900-010 | 2014/2015 | Gate | 3114 | HICKORY LEASING |
| | | | 900-020 | 2014/2015 | Pellet Silo Storage | 3114 | HICKORY LEASING |
| | | | 900-025 | 2014/2015 | Electric gate | 3114 | HICKORY LEASING |
| | Schlagel | | 900-110 | 2014/2015 | Bin Reclaim Drag | 3114 | HICKORY LEASING |
| | Schlagel | 36147-Galv | 900-120 | 2014/2015 | Transfer Bucket Elevator to Loadout | 3114 | HICKORY LEASING |
| **Equipment not Listed on PFDs** | | | | | | | |
| **Building 2** | | | | | | | |
| | | | | 2011 | Infeed Hopper, conveyor, screener | 2825 | BTHQH |
| | | | | 2011 | Hog Infeed and Hog Bypass conveyor | 2825 | BTHQH |
| | | | | 2011 | WPS Infeed | 2825 | BTHQH |
| | | | | 2011 | WPS Bin | 2825 | BTHQH |
| | | | | 2011 | Quad In feed conveyor | 2825 | BTHQH |
| | | | | 2011 | #1 Reactor, #2 Reactor, #3 Reactor | 2825 | BTHQH |
| | | | | 2011 | #1, 2 and 3 Reactor Outfeed Screws | 2825 | BTHQH |
| | | | | 2011 | Reactor #4 and 5 infeed conveyor | 2825 | BTHQH |
| | | | | 2011 | #1 HRTO | 2825 | BTHQH |
| | | | | 2011 | #5 Surge Bin | 2825 | BTHQH |
| | | | | 2011 | #5 Infeed Conveyor | 2825 | BTHQH |
| | | | | 2011 | #5 Reactor | 2825 | BTHQH |
| | | | | 2011 | #2 HRTO | 2825 | BTHQH |
| | | | | 2011 | #5 Outfeed Reactor Collection Conveyor | 2825 | BTHQH |
| | | | | 2011 | Five CPM Pellets Mills | 2825 | BTHQH |
| | | | | 2012 | #4 Reactor | 2939 | BTHQH |
| | | | | 2012 | #4 Surge Bin | 2939 | BTHQH |
| | | | | 2012 | #4 Infeed Conveyor | 2939 | BTHQH |
| | | | | 2012 | #4 Outfeed Reactor Collection Conveyor | 2939 | BTHQH |
| | | | | 2012 | Briquette Machine | 2939 | UTICA |
| | | | | | | | |
| **Desks, Computers, furniture, office equipment , etc** | | | | 2011-2014 | Mixed vareity | 2825 and 2940 | |
| | | | | | | | |
| | | | | | | | |
| **MCC Rooms (Partial List)** | Toshiba | VFAS1-4370PL-HN | | | 50HP 460V AS1 Toshiba Inverter. DC Link Reactor- Includes Dynamic Braking Circuit | | UTICA |
| | | VFAS1-4450PL-HN | | | 60HP 460V AS1 Toshiba Drive. DC Link Reactor- Includes Dynamic Braking Circuit | | UTICA |
| | | VFAS1-4550PL-HN | | | 75HP 460V AS1 Toshiba Drive. DC Link Reactor- Includes Dynamic Braking Circuit | | UTICA |

BTH QUITMAN HICKORY EQUIPMENT LIST

| Location within Plant | Vendor | Model | ID on PFDs | Year Placed in Service | Machine Description | Clarke County PINN Number | Owner / Secured Party |
|---|---|---|---|---|---|---|---|
| | | VFAS1-4900PC-H1 | | | 125HP 460V AS1 Toshiba Inverter | | UTICA |
| | | VFAS1-4200KPC-H1 | | | 300 HP 460V AS1 Toshiba Inverter. 387 Amps-DC Link Reactor Not included. | | UTICA |
| | | RKP004Z | | | Toshiba Remote LCD Keypad for VFAS1 unit | | UTICA |
| | | CAB0015-0A | | | 5 meter cable for remote mounting cable-15ft-for RDP00xZ keypads | | UTICA |
| | | SBP006Z | | | Mounting kit for RKP004Z LCD Keypad maintains IP54 rating (docking station) | | UTICA |
| | | SBP007Z | | | Toshiba IP65 door attaches to the SBP006Z mounting kit for the RKP004Z keypad | | UTICA |
| | | ETH-1000 | | | Network gateway that supports the following protocols: AB CSP (PCCC), Ethernet/IP, BACnet/ip, BACnet MS/TP, Modbus/TCP, Modbus RTU, Profinet IO, Metasys N2 | | UTICA |
| | | MOIB0331X4K2 | | | Cutler Hammer MCC- Motor Control Center 60HZ, Class 1B wiring, 480V 3-phase service for: MCC-1 Wood Yard, MCC-2 Wood Yard, MCC-3 Wood Yard, Dry Chip MCC, Mixer Area MCC, Pellet Mill 6 MCC, Pellet Mill 7 MCC, Pellet Mill 8 MCC, Pellet Mill 9 MCC, MCC-44201 Addn., MCC-54201 Addn. | | UTICA |
| | | Q140130CMG | | | 550 Hp AS1 Drive Toshiba Motor | | UTICA |
| | | 4F4500L181685 | | | 500HP 1800RPM 460V Toshiba Motor | | UTICA |
| | | 6F4450L1KP | | | 450HP 1200RPM 460V Toshiba Motor | | UTICA |
| | | HX7+D412LCB1-1 | | | 1200HP 460V HX7 Toshiba Drive | | UTICA |
| | | MOIB0331X4K2-4000 | | | Cutler Hammer Switchgear- 4000 Main breaker with 10 800 amp feeder breakers | | UTICA |
| | | MOIB0331X4K2-1600 | | | Cutler Hammer Switchgear- 1600 Main breaker with 3 800 amp feeder breakers | | UTICA |
| | | VFAS1-4037PL-HN | | | 5HP 460V AS1 Toshiba Inverter. DC Link Reactor-Includes Dynamic Braking Circuit | | UTICA |
| | | VFAS1-4055PL-HN | | | 7.5HP 460V AS1 Toshiba Inverter. DC Link Reactor-Includes Dynamic Braking Circuit. | | UTICA |
| | | VFAS1-4075PL-HN | | | 10HP 460V AS1 Toshiba Drive. DC Link Reactor-includes Dynamic Braking Circuit | | UTICA |
| | | VFAS1-4110PL-HN | | | 15HP 460 Volt Toshiba Drive. DC Link Reactor-Includes Dynamic Braking Circuit. | | UTICA |
| | | VFAS1-4185PL-HN | | | 25HP 460V AS1 Toshiba Drive. DC Link Reactor-Includes Dynamic Braking Circuit. | | UTICA |
| | | VFAS1-4220PL-HN | | | 30HP 460V AS1 Toshiba Drive. DC Link Reactor-Includes Dynamic Braking Circuit. | | UTICA |
| | | VFAS1-4300PL-HN | | | 40HP 460V AS1 Toshiba Drive. DC Link Reactor-Includes Dynamic Braking Circuit. | | UTICA |

**BTH QUITMAN HICKORY EQUIPMENT LIST**

| Location within Plant | Vendor | Model | ID on PFDs | Year Placed in Service | Machine Description | Clarke County PINN Number | Owner / Secured Party |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Transformers | | Four Transformers | | | three - 2500 KVA Tansformers and one 1500 KVA Transformer | | UTICA |
| | | | | | | | |
| PLC Panels | Sumter Electric | | | | PLC Panels | | UTICA |
| | | | | | | | |
| Process Sensors | Process Sensors Corp. | Model 460-WP NIR Transmitter | | | Process Transmitter | | UTICA |
| Generator | TSI | Back up Generator | | | Back up Generator | | UTICA |
| | | | | | | | |
| Building 2 | Environmental Pneumatics | Customized 3/16" stainless steel horizontal and vertical manifolds between 2 reactors and RTO's | | | Reactor Vents | | BTHQH |
| | | | | | | | |
| North of Building 2 | Environmental Pneumatics | Customized 125 hp steel fan package with Inverter Duty motor for VOC Collection System | | | Collection System for VOCs and Emissions Vent Pipe from Hammermills to Dry Burner | | BTHQH |
| | | | | | | | |
| Building 1 | Power Equipment Company | Air Compression System | | | Air Compression Systems | | BTHQH |
| | | | | | | | |
| Control Room | Ram Security | Camera Systems and Recorders | | 2015 | Camera System and Recorders | | BTHQH |
| | | | | | | | |
| NOTE: Building 3 Decommissioned Equipment and Spare Parts | | | | 2012-2015 | Five Decommissioned CPM Pellets Mills , Spare Parts including pellet mill dies and rolls (some also in Building 1), motors, screen, tools, etc. | | BTHQH |
| Two Modular Office Buildings | | | | 2011 | | 2825 | Sustainable Modular Management |
| Two CAT Front Wheel Loaders | | | | 2012-2014 | | | Caterpiller |

**BTH QUITMAN HICKORY EQUIPMENT LIST**

| Location within Plant | Vendor | Model | ID on PFDs | Year Placed in Service | Machine Description | Clarke County PINN Number | Owner / Secured Party |
|---|---|---|---|---|---|---|---|
| variety of motor controls, air conditioners, transformers, switch gear, not listed above | | | | 2011-2015 | | | UTICA |
| | | | | | | | |
| Motors and instruments substancially all of which are reflected on the PI&Ds | | | | | | | Varies according to equipment |
| | | | | | | | |
| All torrefaction equipment and other equipment in Building 2 - Note otherwise listed above | | | | 2011-2014 | | | BTHQH |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## **<u>Schedule 4.8(a)</u>**

Environmental Permits

The Seller holds the following issued by the Mississippi Department of Environmental Quality:

1.  Air Pollution Control Permit to Construct Air Emissions Equipment No. 0440-00063 for Solvay Biomass Energy, LLC at 252 Hickory Street, Quitman, MS.  MDEQ issued this permit on December 9, 2010 to BTH Quitman Hickory LLC, received a request to transfer this permit to Solvay Biomass Energy, LLC on January 28, 2015, and most recently modified this permit on March 17, 2015.

2.  Title V Operating Permit Application by Solvay Biomass Energy LLC dated December 15, 2015 and received by MDEQ on December 16, 2015.

3.  Baseline General Permit No. MSR002034 for Solvay Biomass Energy LLC.  MDEQ issued this permit to BTH Quitman Hickory LLC on May 26, 2011 and received a request to transfer this permit to Solvay Biomass Energy, LLC on January 28, 2015.

## **Exhibit A**

Bill of Sale

# BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

_____, 2018

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**_Bill of Sale_**") is delivered as of the date hereof pursuant to that certain Asset Purchase Agreement, dated October 12, 2018 (the "**_Purchase Agreement_**"), between Mohegan Renewable Energy (MS), LLC (together with its permitted successors, designees and assigns, "**_Buyer_**"), and BTH Quitman Hickory LLC, Hickory Operating 1 LLC, Hickory Operating 2 LLC, Hickory Operating 3 LLC, and Hickory Leasing LLC (collectively, "**_Seller_**"). Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and pursuant to the Purchase Agreement, the Seller hereby assigns, sells, transfers and sets over to Buyer (i) all of Seller's right, title, and interest in and to the Acquired Assets, free and clear of all Liens and Claims and (ii) all of the Assumed Liabilities.  Buyer hereby accepts the assignment of the Acquired Assets, and hereby assumes and agrees to perform the Assumed Liabilities, effective from and after the date hereof.

Buyer is not acquiring, and nothing contained herein is intended to convey to Buyer any of Seller's right, title and interest in and to, any of the Excluded Assets.

Except for the representations and warranties contained in Article IV and Article V of the Purchase Agreement, neither Seller nor Buyer makes any other representation or warranty whether express or implied, written or oral, with respect to the Acquired Assets or Assumed Liabilities, including, without limitation, any express or implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Acquired Assets.

This Bill of Sale is not intended to convey any greater or lesser obligations to Buyer than are described in the Purchase Agreement, nor is this Bill of Sale intended to supplement, modify or expand any of the representations or warranties of Seller set forth in the Purchase Agreement.  Nothing contained in this Bill of Sale shall be construed to supersede, amend, limit or qualify any provision of the Purchase Agreement.  To the extent there is a conflict or ambiguity between the terms and provisions of this Bill of Sale and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern.

Each of the parties shall execute and deliver or cause to be executed and delivered to the other party such other instruments and take such other action, all as the other party may reasonably request, in order to carry out the intent and purpose of this Bill of Sale.

This Bill of Sale may be executed in multiple counterparts, each of which will be deemed an original and all of which, when taken together, will constitute one and the same agreement.  Delivery of an executed signature page of this Bill of Sale by facsimile or other electronic transmission shall be effective as delivery of a manually executed original signature page of this Bill of Sale.

IN WITNESS WHEREOF, the undersigned have duly executed this Bill of Sale and Assignment and Assumption Agreement as of the date first set forth above.

**BUYER:**

MOHEGAN RENEWABLE ENERGY (MS), LLC

By:_____

Name:  Mark D. Boivin

Title:   President

**SELLER:**

| BTH QUITMAN HICKORY LLC | HICKORY OPERATING 1, LLC |
|---|---|
| By: BTH Quitman LLC, Manager | |
| | |
| By:_____ | By:_____ |
| Name:  Neal Smaler | Name:_____ |
| Title:  President | Title:_____ |
| HICKORY OPERATING 2, LLC | HICKORY OPERATING 3, LLC |
| | |
| By:_____ | By:_____ |
| Name:_____ | Name:_____ |
| Title:_____ | Title:_____ |
| HICKORY LEASING, LLC | |
| | |
| By:_____ | |
| Name:_____ | |
| Title:_____ | |

**Exhibit 10.2(d)**

Title Commitment Affidavits

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**

**AFFIDAVIT AND AGREEMENT**


STATE OF _____

COUNTY OF _____

(OWNERS AND CONTRACTORS)

(FINAL)


       PERSONALLY appeared before me, the undersigned authority in and for said county and state, the undersigned owner who after being first duly sworn states on oath:

       It is the owner in connection with improvements on the real property situated in the County of Quitman, State of Mississippi and further described in Exhibit A attached hereto.

       The undersigned owner states that to its personal knowledge, no other contracts have been let or guarantees of payment made by the undersigned owner to anyone other than: (List each contract let or guarantee made and obtain affidavit and agreement for each OR if none, state "None"):_____.

       The owner has no interest or ownership in the contracting firm or firms and the contractor has no interest in the real property described above, except (if none, state "None"): _____.

       The undersigned owner is in possession of the subject premises, unless otherwise stated: (List possession other than by owner, such as leases, etc OR if none, state "None". _____.

       The contractor has been paid in full for work or services performed and materials furnished on the above project to date does hereby waive, release and surrender any and all lien or claim or right of lien, including amounts earned but retained under the contract with owner, to the date for which payment is made, for labor, services, and/or materials furnished by the undersigned upon the premises described above, except: (If none, state "None") _____.

       The owner has paid in full any and all amounts due architects, engineers, surveyors, attorneys, subcontractors, materialmen and labors for work or services performed and materials furnished to date to the undersigned in connection with the construction of the improvement on the above property, except: (If none, state "None") _____.

       The owner has received no notice of any unpaid bills or claims for labor or services performed or materials furnished on the above project, except: (If none, state "None") _____.

The owner states that no chattel mortgages, conditional sales contracts, security agreements, financing statements, retention of title agreements, personal property leases or the like have been given or are now outstanding as to any materials, fixtures, appliances, furnishings or equipment placed upon, installed in or upon the aforesaid premises or the improvements thereon, and that all plumbing, heating, lighting, refrigerating and other equipment stored or installed is fully paid for and,

The owner hereby requests Fidelity National Title Insurance Company to issue its policy or policies of title insurance, or endorsements thereto, upon said real estate without exception therein as to any possible unfiled mechanics' or materialmen's liens, and in consideration thereof, and as in inducement therefor, the undersigned does hereby agree to indemnify and hold harmless the said Fidelity National Title Insurance Company of and from any and all loss, cost, damage and expense of every kind including attorney's fees, which said Fidelity National Title Insurance Company shall suffer or may suffer or incur or become liable for under its said policy or policies now to be issued, or any reissue, renewal or extension thereof, or a new policy anytime issued upon said real estate, part thereof or interest therein arising, directly or indirectly, out of or on account of any such mechanics' or materialmen's liens, claim or claims as a result of the undersigned unpaid bills or in connection with its enforcement of its rights under this agreement.

– **OWNER** –

**BTH QUITMAN HICKORY, LLC**

By: _____

Printed Name: _____

Title: _____

SWORN TO AND SUBSCRIBED before me, the owner whose signature appears above, this the **_____** day of _____, 2018.

_____

NOTARY PUBLIC

MY COMMISSION EXPIRES:

_____

–2–

## EXHIBIT A

Parcel 1 A

A PART OF SECTIONAL LOT 7 OF SECTION 2, T-2-N, R-15-E, CLARKE COUNTY, MISSISSIPPI.

COMMENCE AT THE SOUTHWEST CORNER OF SECTIONAL LOT 7 OF SECTION 2, T-2-N, R-15- E, CLARKE COUNTY, MISSISSIPPI AND RUN WEST FOR 30.00 FEET.

THENCE RUN NORTH FOR 629.11 FEET TO A FOUND IRON PIPE LOCATED ON THE NORTHERN RIGHT OF WAY OF HICKORY STREET.

THENCE RUN NORTH 88 DEGREES 54 MINUTES 52 SECONDS EAST FOR 80.15 FEET TO A FOUND IRON PIPE AT THE RIGHT OF WAY INTERSECTION OF HARRIS AVENUE AND HICKORY STREET AND FOR THE POINT OF BEGINNING.

THENCE RUN ALONG SAID HARRIS AVENUE RIGHT OF WAY NORTH 00 DEGREES 44 MINUTES 34 SECONDS WEST FOR 727.79 FEET TO A FOUND IRON PIN.

THENCE LEAVING SAID RIGHT OF WAY RUN SOUTH 89 DEGREES 59 MINUTES 56 SECONDS EAST FOR 814.55 FEET TO A FOUND IRON PIPE LOCATED ON THE WESTERN RIGHT OF WAY OF THE KANSAS CITY SOUTHERN RAILROAD.

THENCE RUN ALONG SAID RAILROAD RIGHT OF WAY ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 5687.92 FEET; AN ARC LENGTH OF 714.22 FEET; A CHORD LENGTH OF 713.75 FEET; AND A CHORD BEARING OF SOUTH 03 DEGREES 41 MINUTES 26 SECONDS EAST TO A FOUND IRON PIN ON THE NORTHERN RIGHT OF WAY OF HICKORY STREET.

THENCE RUN ALONG SAID NORTHERN RIGHT OF WAY SOUTH 88 DEGREES 57 MINUTES 37 SECONDS WEST FOR 851.19 FEET BACK TO THE POINT OF BEGINNING, SAID PARCEL CONTAINING 13.89 ACRES, MORE OR LESS, AND BEING LOCATED IN PART OF SECTIONAL LOTS 6 AND 7 OF SECTION 2, T-2-N, R-15-E, CLARKE COUNTY, MISSISSIPPI.

LESS AND EXCEPT: COMMENCE AT THE NORTHWEST CORNER OF THE SW 1/4 OF THE NE 1/4 OF SECTION 2, T-2-N, R-15-E, CLARKE COUNTY, MISSISSIPPI AND RUN SOUTH 379.00 FEET.

THENCE RUN SOUTH 89 DEGREES 35 MINUTES 00 SECONDS EAST FOR 745.56 FEET TO THE POINT OF BEGINNING.

THENCE RUN NORTH 03 DEGREES 54 MINUTES 34 SECONDS WEST FOR 100.00 FEET.

THENCE RUN SOUTH 89 DEGREES 35 MINUTES 00 SECONDS EAST 145.70 FEET TO THE WESTERN RIGHT OF WAY OF THE KANSAS CITY SOUTHERN RAILROAD.

THENCE RUN ALONG SAID RIGHT OF WAY ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 5687.92 FEET; AN ARC LENGTH OF 100.00 FEET; A CHORD LENGTH OF 100.00 FEET; AND A CHORD BEARING OF SOUTH 03 DEGREES 41 MINUTES 26 SECONDS EAST.

THENCE LEAVING SAID RIGHT OF WAY RUN NORTH 89 DEGREES 35 MINUTES 00 SECONDS WEST FOR 145.64 FEET BACK TO THE POINT OF BEGINNING, SAID PARCEL CONTAINING 0.34 ACRES, MORE OR LESS, AND BEING LOCATED IN PART OF SECTIONAL LOT 7 OF SECTION 2, T-2-N, R-15-E, CLARKE COUNTY, MISSISSIPPI.

–4–

44575742.v1

Exhibit A - continued

**Parcel 1 B**

A PART OF SECTIONAL LOT 6 OF SECTION 2, T-2-N, R-15-E, CLARKE COUNTY, MISSISSIPPI.

COMMENCE AT THE SOUTHWEST CORNER OF SECTIONAL LOT 7 OF SECTION 2, T-2-N, R-15- E, CLARKE COUNTY, MISSISSIPPI AND RUN WEST FOR 30.00 FEET.

THENCE RUN NORTH FOR 629.11 FEET TO A FOUND IRON PIPE LOCATED ON THE NORTHERN RIGHT OF WAY OF HICKORY STREET.

THENCE RUN NORTH 00 DEGREES 50 MINUTES 41 SECONDS WEST FOR 320.06 FEET TO A FOUND IRON PIPE.

THENCE RUN NORTH 89 DEGREES 13 MINUTES 02 SECONDS EAST FOR 20.42 FEET TO A SET IRON PIN ON THE WESTERN RIGHT OF WAY OF HARRIS AVENUE AND THE POINT OF BEGINNING.

THENCE RUN SOUTH 89 DEGREES 13 MINUTES 02 SECONDS WEST FOR 661.00 FEET TO A FOUND IRON PIN.

THENCE RUN NORTH 00 DEGREES 38 MINUTES 36 SECONDS EAST FOR 418.01 FEET TO A FOUND IRON PIPE.

THENCE RUN SOUTH 89 DEGREES 59 MINUTES 56 SECONDS EAST FOR 491.05 FEET TO A SET IRON PIN.

THENCE RUN SOUTH 00 DEGREES 31 MINUTES 07 SECONDS EAST FOR 100 FEET TO A SET IRON PIN.

THENCE RUN SOUTH 89 DEGREES 59 MINUTES 56 SECONDS EAST FOR 160 FEET TO A SET IRON PIN ON THE WESTERN RIGHT OF WAY OF HARRIS AVENUE.

THENCE RUN ALONG SAID WESTERN RIGHT OF WAY SOUTH 00 DEGREES 47 MINUTES 45 SECONDS EAST FOR 308.97 FEET BACK TO THE POINT OF BEGINNING, SAID PARCEL CONTAINING 5.86 ACRES, MORE OR LESS, AND BEING LOCATED IN PART OF SECTIONAL LOT 6 OF SECTION 2, T-2-N, R-15-E, CLARKE COUNTY, MISSISSIPPI.

–5–

## Parcel 2

COMMENCE AT THE NORTHWEST CORNER OF THE SW 1/4 OF THE NE 1/4 OF SECTION 2, T-2-N, R-15-E, CLARKE COUNTY, MISSISSIPPI AND RUN SOUTH 379.00 FEET.

THENCE RUN SOUTH 89 DEGREES 35 MINUTES 00 SECONDS EAST FOR 745.56 FEET TO THE POINT OF BEGINNING.

THENCE RUN NORTH 03 DEGREES 54 MINUTES 34 SECONDS WEST FOR 100.00 FEET.

THENCE RUN SOUTH 89 DEGREES 35 MINUTES 00 SECONDS EAST 145.70 FEET TO THE WESTERN RIGHT OF WAY OF THE KANSAS CITY SOUTHERN RAILROAD.

THENCE RUN ALONG SAID RIGHT OF WAY ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 5687.92 FEET; AN ARC LENGTH OF 100.00 FEET; A CHORD LENGTH OF 100.00 FEET; AND A CHORD BEARING OF SOUTH 03 DEGREES 41 MINUTES 26 SECONDS EAST.

THENCE LEAVING SAID RIGHT OF WAY RUN NORTH 89 DEGREES 35 MINUTES 00 SECONDS WEST FOR 145.64 FEET BACK TO THE POINT OF BEGINNING, SAID PARCEL CONTAINING 0.34 ACRES, MORE OR LESS, AND BEING LOCATED IN PART OF SECTIONAL LOT 7 OF SECTION 2, T-2-N, R-15-E, CLARKE COUNTY, MISSISSIPPI.

–6–

GAP INDEMNITY AGREEMENT

**THIS AGREEMENT** is made and entered into this ___ day of _____, 2018 by and between **BTH QUITMAN HICKORY, LLC** ("Indemnitor"), and **FIDELITY NATIONAL TITLE INSURANCE COMPANY** ("Fidelity National Title") and its agents.

Indemnitor is the owner of that certain real property hereinafter referred to as the "Property" in Commitment No. FT00033-18, with an effective date of September 17, 2018 (the "Commitment").

Indemnitor is contemplating selling the Property and Fidelity National Title and its agents have been requested to issue policies of title insurance in connection therewith.

For and in consideration of Fidelity National Title and its agents issuing the policies without taking exception to or making requirements to remedy the effect of interests in the Property created by instruments first appearing of record after the effective date of the Commitment and prior to the effective date of the policies of the title insurance to be issued under the Commitment hereinafter referred to as "Gap Interests", Indemnitor does hereby agree to hold and save Fidelity National Title and its agents harmless, and to protect and indemnify Fidelity National Title and its agents from and against any and all liabilities or claims of liability, losses, costs, charges, expenses and damages of any kind of character whatsoever, including, but not limited to reasonable attorney's fees incurred or sustained by Fidelity National Title and its agents by reason of or arising out of Gap Interests where such Interests are based upon or arise in any way as a result of any action or inaction by or on behalf of Indemnitor, which Fidelity National Title or its agents incur or sustain directly or indirectly under any policies of title insurance issued pursuant to this Gap Indemnity Agreement.

– **INDEMNITOR** –

**BTH QUITMAN HICKORY, LLC**

By: _____

Printed Name: _____

Its: _____

44576419.v1